UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LUOKUNG TECHNOLOGY CORP., et al.

         *Plaintiffs,*

v.

U.S. DEPARTMENT OF DEFENSE, et al.

         *Defendants.*

Case No. 1:21-cv-00583 RC

## DECLARATION OF CHARLES M. STEELE

I, Charles M. Steele, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner with Forensic Risk Alliance, an international forensic accounting and consulting firm. My current practice includes advising clients with respect to economic sanctions issues and other regulatory and criminal matters.

2. I have been engaged as an expert by Dorsey & Whitney LLP, which is counsel to Luokung Technology Corp. ("Luokung"). I have been asked to offer independent expert opinions generally concerning the listing of entities as "Communist Chinese military companies" ("CCMCs"), in connection with Executive Order ("EO") 13959 issued by former President Trump on November 12, 2020, and amended by EO 13974 issued by him on January 13, 2021 (both EOs having been issued pursuant to, among other authorities, the International Emergency Economic Powers Act, 50 U.S.C. 1701 *et seq.* ("IEEPA")), and under the authority of Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, and related governmental processes.

3. I make this declaration based upon my personal knowledge and my professional experience. My statements herein are not based on, and I do not disclose herein, any confidential government information. I am over eighteen years of age and competent to testify to the matters

1

set forth herein.

4.      In this declaration I offer certain opinions as to the topics described in paragraph 2, above. This declaration does not contain an exhaustive recitation of all of my opinions on these topics, or all facts that might be relevant to those topics.

5.      In summary, my opinion is that the timing, circumstances, and substance of EOs 13959 and 13974, and of related public statements and guidance, indicate that the interagency governmental process used in the formulation and implementation of the EOs was materially different than interagency processes used with respect to other IEEPA-based sanctions EOs over the past several years; that the process appears to have been rushed and haphazard as the change in presidential administrations approached; and that input and involvement from those with primary responsibility for implementing and administering U.S. economic sanctions – particularly the Treasury Department's Office of Foreign Assets Control ("OFAC") – appears to have been either not sought or disregarded to a degree that, in my experience, would be highly unusual. Overall, based on my knowledge, experience, and the available information, it is my opinion that the governmental processes relating to the issuance of EOs 13959 and 13974, and the consequent listing of and restrictions imposed on identified CCMCs, were extremely atypical.

**A.      Education And Experience**

6.      I have more than thirty (30) years of government and private-sector experience in civil and criminal compliance, investigations, enforcement, and litigation matters, in a variety of industries and sectors. I served in eight senior positions in six U.S. government regulatory, national security, and law enforcement agencies in the Treasury and Justice Departments, including OFAC (the U.S. government's primary economic sanctions agency, where I served first as Associate Director for Enforcement and later as Chief Counsel); the Financial Crimes Enforcement Network ("FinCEN," the U.S. government's primary Bank Secrecy Act/Anti-Money Laundering

("BSA/AML") agency, where I served as Deputy Director); the Office of the Comptroller of the Currency (the U.S. government's primary supervisor and regulator of national banks, federal savings associations, and federally licensed branches of foreign banks in the United States); the Justice Department; and the FBI. I also have senior private-sector experience working as a forensic advisory consultant and a lawyer at two global law firms. Since 2009, I have focused primarily on economic sanctions and BSA/AML matters, in both the government and the private sector.

7.  When I was Chief of Staff in the Justice Department's National Security Division (2006-09), my direct reports included the head of the unit which represents the Department on, and does the staff-level work with respect to, the Committee on Foreign Investment in the United States ("CFIUS"). That unit is now called the Foreign Investment Review Section.

8.  A true and correct copy of my current resume is attached as **Exhibit A** hereto.

**B.  General Description of Relevant Interagency Processes**

9.  In most of my government roles from 1999 to 2020, I had substantial experience with respect to interagency processes on national security and law enforcement matters, including processes led by the National Security Council ("NSC"). The NSC is an organization within the White House that leads groups of representatives of various departments and agencies in formulating and coordinating execution of policies and priorities on a wide range of topics with national security and foreign policy aspects. I participated in several such NSC interagency processes myself, and/or supervised others who did so, in my roles as FBI Deputy General Counsel (1999-2003), Chief of Staff of the Justice Department's National Security Division (2006-09), Deputy Director of FinCEN (2009-11), Associate Director for Enforcement at OFAC (2011-13), and OFAC Chief Counsel (2019-2020).

10. As OFAC Chief Counsel I participated in, and supervised others who participated in, interagency processes related to exercises of authority under IEEPA. I also had general

3

knowledge of several such matters when I served as OFAC's Associate Director for Enforcement. IEEPA is one of the principal statutes upon which U.S. economic sanctions are based, and it was the principal statute underlying EOs 13959 and 13974. In my experience, although IEEPA-based sanctions interagency processes do not strictly follow a single model in all cases from one EO to the next, certain departments and agencies are always involved. Generally speaking, the State Department and the NSC play principal roles with respect to policy formulation. The Treasury Department, including OFAC, also participates in policy formulation. In my experience and to my knowledge, the drafting of sanctions-related EOs has usually been led by OFAC, with input from all participants in the particular matter (including the State Department and the NSC). The Justice Department typically offers legal advice at various points in the process, and provides final legal approval before the EO is presented to the President for signature. Other departments and agencies can be brought in as relevant and appropriate to the subject matter under consideration for the new EO.

11.     In my experience and opinion, OFAC – as the long-time administrator of U.S. sanctions – has the greatest expertise as to the meaning of particular language in EOs, regulations, and other sanctions contexts, including as to how such language has been applied in the past, and what types of direct and collateral consequences particular language can have (for example, causing general confusion which might need to be addressed by public guidance).

C.     **Executive Order 13959 (November 12, 2020)**

12.     On November 12, 2020, President Trump issued EO 13959, "Addressing the Threat From Securities Investments That Finance Communist Chinese Military Companies." By that date, there had been widespread public reporting that Former Vice President Biden had won the November 3 presidential election, although the election had not yet been certified.

13.     Several aspects of EO 13959 were unusual, in my opinion. I address some of them

below.

14. Section 4 is the Definitions section. Section 4(e) defines "transaction" as follows: "the term 'transaction' means the purchase for value of any publicly traded security." In my opinion the inclusion of this term in the EO's prohibitions (in sections 1(a)(i) and (ii)), particularly when coupled with such an extremely narrow definition, deviated substantially from the usual practice with respect to IEEPA-based sanctions EOs. First, in the relatively rare occasions when the word "transaction" is included in the prohibitions sections of sanctions EOs, it is most often used together with the expansive term "dealings" (i.e., "transactions and other dealings"). That was not the case here; in this EO, the term "transactions" stood alone in the prohibitions sections. In addition, when terms are defined in EOs and in OFAC's regulations, OFAC tends not to define them narrowly, and OFAC likewise construes undefined terms very broadly, so as to provide maximum flexibility in administering the policy choices reflected in the EO. The extraordinarily narrow definition used in this EO is decidedly at odds with that practice. Moreover, the term "transactions" is used in the "evades or avoids" provision, section 2(a), that relevantly reads as follows: "Any transaction ... that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibitions set forth in this order is prohibited." This is a standard clause in IEEPA-based sanctions EOs, and it almost always, if not always, uses the word "transaction." However, that term is typically not defined in sanctions EOs, and as noted above is therefore broadly construed by OFAC. In contrast and because of the highly unusual and extremely narrow definition of "transaction" in EO 13959, the "evades or avoids" clause there applied only to "purchases for value"; on its face, the EO did not prohibit any other types of transactions designed to evade or avoid the order. To my knowledge this was unprecedented, and seems obviously incompatible with any conceivable government aim to ensure broad compliance with

the EO. In my opinion and for all of these reasons, to define the term "transaction" as narrowly as it was defined in EO 13959 was highly inconsistent with long-standing sanctions practice, without any apparent benefit to the government's goals. I would not expect to see this had OFAC played its usual role in the formulation and drafting of the EO.

15. In addition, the prohibitions in sections 1(a)(i) and (ii) of the EO included two terms – "publicly traded securities" and "designed to provide investment exposure" – which, to my knowledge, do not have single, commonly-known meanings, and which were not defined in the EO. It appeared inevitable that these terms would cause uncertainty and confusion, and that public guidance would be needed in short order.

16. Section 1(b) set forth a carve-out from the prohibitions, for "purchases for value or sales" made within a certain timeframe "solely to divest" from specified securities. In my opinion this language was notable for two reasons. First, it was not necessary to include "sales" in the carve-out because, as noted above, "sales" were not included in the EO's definition of "transactions," and were therefore not prohibited. Second, to my knowledge the word "solely" has not been used in previous situations in which EOs or OFAC authorized divestment; and, the EO did not define the term. Again, I would not have expected to see these examples had OFAC played its usual role with respect to formulation and drafting of the EO.

17. Section 3(a) authorizes the Secretary of the Treasury to (among other things) promulgate rules and regulations subject to certain interagency consultation requirements. This is not unusual. However, section 3(b) is unusual, in my opinion. It states that "prior to issuing any license under this order [to allow transactions that would otherwise be prohibited by the EO], the Secretary of the Treasury shall consult with the Secretary of State, the Secretary of Defense, and the Director of National Intelligence." I do not recall seeing this language in previous sanctions

EOs. In my opinion it is unclear what this provision achieves that is not already achieved by the standard language in section 3(a), which appears to be broad enough to ensure that the other departments and agencies are to be consulted before OFAC issues licenses (since issuing a license would be to take an action, and to employ a power granted to the President by IEEPA, to carry out the purposes of the EO). Again, I would not expect to see this type of drafting issue had the ordinary interagency processes been followed.

### D.   OFAC's First Set of Frequently Asked Questions (FAQs) and Publication of New "Non-SDN Communist Chinese Military Companies List" (December 28, 2020)

18.   On December 28, 2020, OFAC issued a set of five FAQs (numbers 857-861) relating to EO 13959, and also published a new "Non-SDN Communist Chinese Military Companies List," with names and certain identifying information of entities that had been identified as CCMCs.

19.   FAQs are one of OFAC's principal means to provide guidance to the private sector as to the meaning, scope and applicability of EOs, regulations, General Licenses, etc.

20.   These first five FAQs dealt with the applicability of the EO to subsidiaries of publicly listed entities (FAQ 857); the applicability of the EO's prohibitions with respect to publicly traded securities of an entity with a name "that exactly or closely matches the name of" an identified and publicly listed entity (FAQ 858); how OFAC intends to interpret the term "publicly traded security" (FAQ 859); what financial instruments are covered by the prohibitions against any transaction "in securities that are derivative of, or are designed to provide investment exposure to such" publicly traded securities (FAQ 860); and the applicability of the prohibitions to U.S. or foreign funds, such as exchange-traded funds (ETFs) or other mutual funds, that hold publicly traded securities of a CCMC (FAQ 861).

**E.      Press Statement by the Secretary of State (December 28, 2020)**

21.    On that same day – December 28, 2020 – then-Secretary of State Pompeo issued a Press Statement titled "Protecting U.S. Investors from Financing [CCMCs]" (the "Press Statement").

22.    The Press Statement stated, among other things: "Today, the Treasury Department noted that Executive Order 13959 prohibits the **ownership** of any CCMC shares by exchange-traded funds (ETFs) and index funds, as well as any of their 50 percent or greater majority-owned subsidiaries that have been publicly listed by the Treasury Department" (emphasis added). It also stated that "full divestment" was "required" by November 11, 2021.

23.    In fact, none of OFAC's December 28 FAQs made statements to the effect that the EO prohibited ownership or required divestment. Moreover, as noted above, the plain language of the EO prohibited only *purchases* that met the other terms of the EO. This was a function of the EO's highly unusual and extremely narrow definition of the term "transaction." The plain language of the EO did not prohibit sales or any other types of dealings (other than purchases), and it did not prohibit mere possession (or "ownership"). And while it *permitted* certain transactions conducted "solely to divest," it did not *require* divestment.

24.    In my opinion, these serious and obvious inaccuracies in the Press Statement revealed a very high degree of confusion, and lack of coordination and/or communication, in the interagency process around the EO. Further, in my opinion, there is no possibility that OFAC would have been confused as to whether the language of the EO prohibited "ownership" (or possession), or required divestment, given OFAC's long experience in drafting, implementing, administering, and enforcing IEEPA-based sanctions EOs. In my opinion, the most likely explanation is that the confusion, at least as to these points, lay in departments and agencies other than OFAC and Treasury, including but not necessarily limited to the State Department and the

NSC.

### F.  OFAC FAQ 862 (January 4, 2021)

25. On January 4, 2021 – one week after then-Secretary Pompeo's inaccurate Press Statement – OFAC issued a new FAQ, number 862, confirming that EO 13959 does not require divestment. The FAQ reads, in full:

[Q] Does Executive Order (E.O.) 13959 require U.S. persons, including U.S. funds and related market intermediaries and participants, to divest their holdings in publicly traded securities (and securities that are derivative of, or are designed to provide investment exposure to, such securities) of the [CCMCs] identified in the Annex to E.O. 13959 by January 11, 2021?

[A] No. Executive Order (E.O.) 13959 does not require U.S. persons, including U.S. funds and related market intermediaries and participants, to divest their holdings in publicly traded securities (and securities that are derivative of, or are designed to provide investment exposure to, such securities) of the [CCMCs] identified in the Annex to E.O. 13959 by January 11, 2021. Please see FAQ 858 for more information regarding the names of entities identified in the Annex to E.O. 13959.

### G.  Congressional Certification of Former Vice President Biden as Winner of the Presidential Election (January 6-7, 2021)

26. Public reports noted that Congress certified Former Vice President Biden as the winner of the presidential election in the early morning hours of January 7, 2021.

### H.  Executive Order 13974 (January 13, 2021)

27. On January 13, 2021 – seven days before the Inauguration – President Trump issued EO 13974, titled "Amending Executive Order 13959 – Addressing the Threat From Securities

Investments That Finance Communist Chinese Military Companies." EO 13974 made a number of amendments to EO 13959, some of which are discussed below. A redline version of the text of EO 13959, which shows all of the amendments implemented by EO 13974, is attached hereto as **Exhibit B**.

28.     EO 13974 amended the original EO's definition of "transaction" by adding "or sale," so that the definition relevantly read as follows: "the term 'transaction' means the purchase for value, or sale, of any publicly traded security."

29.     In my opinion, including but not only because of the Press Statement, it is very unlikely that this reflected a new policy choice developed between November 12, 2020 (the date of the original EO), and mid-January 2021. Rather, in my opinion, it is much more likely that this amendment was made in order to correct the original language to give effect to the original policy choices of the State Department and the NSC.

30.     EO 13974 made two amendments to sections 1(b) and (c) of EO 13959. One amendment was replacing the term "purchases for value or sales" with the word "transaction."

31.     In my opinion, including but not only because of the Press Statement, it is very unlikely that this reflected a new policy choice developed between November 12, 2020, and mid-January 2021. Rather, in my opinion, it is much more likely that this amendment was made in order to correct the original language to give effect to the original policy choices of the State Department and the NSC.

32.     EO 13974 also added new language at the end of the carve-out provisions in subsections 1(b) and 1(c), stating that as of certain dates and time, "possession of any [specified CCMC securities] by a U.S. person is prohibited." Again, in my opinion, including but not only because of the December 28, 2020 Press Statement, it is very unlikely that this reflected a new

10

policy choice developed between November 12, 2020, and mid-January 2021. Rather, in my opinion, it is much more likely that these amendments were made in order to give effect to the original policy choices of at least the State Department and the NSC.

33. In my experience, IEEPA-based sanctions EOs often involve complicated issues, and sometimes must be developed and issued quickly, under timeframes that do not always allow for as much interagency discussion and deliberation as the agencies would like. Accordingly, there have been occasions when EOs were followed in relatively short order by public guidance as to the meaning and applicability of certain language. However, I am aware of no prior case in which (1) a new EO was issued specifically and solely to amend a prior EO that had been issued only two months prior, and (2) there were multiple drafting peculiarities in the first EO of the types in EO 13959, on such obvious and fundamental issues.

34. In my opinion on the basis of my experience, the most likely explanation for the anomalous situation here is that whatever interagency process was followed as to the two EOs was significantly abnormal and rushed, and apparently involved the discounting, if not disregard, of input from OFAC and others with long experience in the drafting and administering of sanctions EOs.

I. **Guidance, and Procedures for Seeking Delisting: OFAC and the Department of Defense**

35. OFAC has several long-standing and well-known processes and resources available for U.S. persons and others – including foreign person subject to sanctions – to seek guidance or other assistance. These include, but are not limited to, FAQs and other types of written guidance, published on OFAC's website; a unit (Sanctions Compliance & Evaluation) whose duties include serving as a resource for financial sector and other entities with urgent compliance questions; and an annual Symposium, open to the public (but with limited seating), in which OFAC officials

11

discuss recent developments and topics of particular interest.

36. In addition, OFAC's regulations include a provision setting forth a procedure by which Specially Designated Nationals (i.e., persons and entities on OFAC's Specially Designated Nationals and Blocked Persons List (the "SDN List")) can seek reconsideration of their designations, and removal from the SDN List. 31 CFR § 501.807 ("Procedures governing delisting from the Specially Designated Nationals and Blocked Persons List"). The regulation allows the blocked person to submit, in writing, arguments or evidence that the person believes establishes that an insufficient basis exists for the designation. It also allows blocked persons to propose, in writing, remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation. 31 CFR § 501.807(a). OFAC will review the submission, and may request clarifying, corroborating, or other additional information. 31 CFR § 501.807(b). The person may also request a meeting with OFAC; however, such meetings are not required, and OFAC may, at its discretion, decline to conduct such meetings prior to completing its review. 31 CFR § 501.807(c). After OFAC has conducted its review, it will provide a written decision to the person. 31 CFR § 501.807(d). EO 13959 as amended, however, does not block the property of CCMCs, and thus designations under EO 13959 fall outside the scope of OFAC's delisting regulation. 31 CFR § 501.807.

37. To my knowledge, the Department of Defense ("DoD") offers no such resources to the public in connection with its CCMC list.

38. To my knowledge, there are no regulatory provisions, and no formal, written policies or procedures, by which DoD offers parties identified and listed as CCMCs a way to request reconsideration and/or delisting.

39. I have reviewed the Declaration of Andrew J. Pahutski, filed in this Court as Exhibit A to Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction in *Xiaomi Corporation, et al., v. U.S. Department of Defense, et al.*, Civil Docket No. 21-cv-00280 (RC) ("Pahutski Decl."). A copy of that declaration is attached hereto as **Exhibit C**. In that action, plaintiffs challenge the DoD's designation of Xiaomi Corporation as a CCMC as being in violation of the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. I understand that similar claims are being asserted in this action.

40. According to the declaration, Mr. Pahutski is DoD's Director of Foreign Investment Review; he reports to the Deputy Assistant Secretary for Industrial Policy and the Under Secretary for Acquisition and Sustainment on matters pertaining to foreign investment review within the United States; and his duties include representing DoD within CFIUS. Pahutski Decl. ¶ 1.

41. The declaration further states that Mr. Pahutski's official duties also include "coordinating interagency packages for decisions by the Deputy Secretary of Defense in response to Section 1237(b) of the National Defense Authorization Act for Fiscal Year 1999 (P.L. 105-261, as amended by section 1233 of P.L. 106-398 and section 1222 of P.L. 108-375)." Pahutski Decl. ¶ 2.

42. In my opinion, placing responsibility for formulation, implementation, and administration of IEEPA-based sanctions in a group that is responsible for a department's CFIUS duties is extremely unusual, if not unprecedented.

43. In the Departments of the Treasury and Justice, for example, the two functions are not assigned to the same staffs. Each department has separate, dedicated staffs for the two functions. In the Treasury Department, OFAC sits in the Office of Terrorism and Financial Intelligence, and reports to the Under Secretary who leads that Office. The CFIUS staff sits in the

13

Office of International Affairs, and reports to the Under Secretary who leads that Office. In the Justice Department, both staffs are in the National Security Division, but in different sections: the Counterintelligence and Export Control Section (which includes those who do sanctions work), and the Foreign Investment Review Section (i.e., the CFIUS staff).

44. In my opinion, placement of the two duties in different staffs is consistent with the fundamentally different natures of sanctions and CFIUS work. Economic sanctions are used as a tool of U.S. foreign policy and national security policy, and are deployed against foreign actors for engaging in activity deemed adverse to U.S. policy goals; the aim is to induce changes in behavior by inflicting severe economic and financial pain on the targets. The goal of CFIUS is to protect U.S. national security, including critical infrastructure, by determining the effect of transactions involving foreign investment in the United States, and prohibiting or placing conditions on those of such transactions as are determined to pose threats.

45. I am not aware of any department or agency, other than apparently DoD, which houses sanctions and CFIUS duties in the same staff.

46. Today (March 5, 2021), I reviewed the public website for DoD's Office of Industrial Policy. There is an organizational chart under the "About" tab. On that chart, Mr. Pahutski's name appears as Director of "Foreign Investment Review." The chart lists two "Key Programs" under his name: "Committee on Foreign Investments [sic] in the United States (CFIUS)" and "Global Market Trends and Non-Notified CFIUS Cases." No other "Key Programs" are mentioned under Mr. Pahutski's name, and there is no mention of CCMCs, or reviews under Section 1237, anywhere on the organizational chart. Near the bottom of the page that contains the chart, however, the following sentence appears: "The office also plays a critical role in representing Department of Defense interests on interagency committees regarding business and economic

issues relevant to national security." In my opinion, these facts also show that the placement of the CCMC function with DoD's CFIUS staff was an ad hoc, rushed decision, most likely unavoidably so because of the rushed nature of the two EOs.

47.  In short and on the basis of the facts described above, my opinion is that the most likely explanation for the unusual if not unprecedented placement of the two functions within the same staff in DoD is that the development of the two EOs, and the related activation of DoD's CCMC list, was not carefully planned or thought out, and that there was likely insufficient time for thought and planning as to how to actually implement and administer the list given the timing pressures caused by the rushed EOs. It appears that DoD – which, unlike OFAC, does not have any known history of administering IEEPA-based economic sanctions – simply placed the function with the existing staff it considered to have the most analogous responsibilities, despite the material differences in the nature of the two functions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2021 in Washington DC

_____
Charles M. Steele