**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LUOKUNG TECHNOLOGY CORP., *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF DEFENSE, *et al.*,<br><br>            Defendants. | Civil Docket No. 21-cv-00583 (RC) |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

    I.    Longstanding United States Concerns Over Chinese Military-
        Civil Integration ................................................................................................ 3

    II.    Statutory Background ........................................................................................ 5

        A.    Historical Overview ............................................................................. 5

        B.    International Emergency Economic Powers Act ("IEEPA") .................... 5

        C.    Section 1237 of the National Defense Authorization Act for
            Fiscal Year 1999, as Amended ............................................................ 7

        D.    Executive Order No. 13959, as Amended ............................................. 8

    III.    Factual Background and Procedural History ....................................................... 10

STANDARD OF REVIEW ................................................................................................. 12

ARGUMENT .................................................................................................................... 13

    I.    Plaintiffs Are Not Likely To Succeed on Their Administrative
        Procedure Act Claims. ...................................................................................... 14

    II.    Plaintiffs Are Not Likely To Succeed on Their Due Process Claim. .................... 22

    III.    Plaintiffs Have Not Established Certain, Imminent Irreparable Harm
         Justifying a Preliminary Injunction .................................................................... 30

    IV.    The Balance of the Equities and Public Interest Strongly Favor
         the Government.................................................................................................. 35

CONCLUSION.................................................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) ......................................................................... 32

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) .................................................................................................... 23

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) ................................................................................. 17

*Ashwander v. Tennessee Valley Auth.*,
297 U.S. 288 (1936) .................................................................................................. 22

*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) ........................................................................... 30

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) .................................................................................................. 28

*Bowman Transp. Inc. v. Ark.-Best Freight System*,
419 U.S. 281 (1976) .................................................................................................. 21

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .................................................................................................. 29

*Capogrosso v. Gelbstein*,
No. 18-cv-2710 (MKB)(LB), 2019 WL 6406444 (E.D.N.Y. Jan. 30, 2019) ........... 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .................................................................................................. 14

*City of Dania Beach v. FAA*,
628 F.3d 581 (D.C. Cir. 2010) ................................................................................. 17

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ............................................................................. 13, 30

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) ................................................................................. 13

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) ........................................................................... 30

*Crooks v. Mabus,*
    845 F.3d 412 (D.C. Cir. 2016) ................................................................ 26

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ............................................................................... 5

*Distributed v. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ................................................................ 36

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Justice,*
    15 F. Supp. 3d 32 (D.D.C. 2014) .......................................................... 29

*Emory Univ. v. Neurocare, Inc.,*
    985 F.3d 1337 (11th Cir. 2021) ............................................................ 19

*FBME Bank Ltd. v. Lew.,*
    209 F. Supp. 3d 299 (D.D.C. 2016) ...................................................... 22

*Figg Bridge Eng'rs, Inc. v. Fed. Highway Admin.,*
    No. 20-cv-2188 (CKK), 2020 WL 4784722 (D.D.C. Aug. 17, 2020) ........................ 32

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ............................................................................. 14

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................. 21

*Gov't Procurement v. United States,*
    576 F. Supp. 2d 162 (D.D.C. 2008) ...................................................... 32

*Greene v. McElroy,*
    360 U.S. 474 (1959) ............................................................................. 25

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................... 15, 36, 37

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003) ........... *passim*

*In re Navy Chaplaincy,*
    738 F.3d 425 (D.C. Cir. 2013) ............................................................... 13

*Islamic Am. Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) ......................................................... 15, 34

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
    933 F. Supp. 2d 58 (D.D.C. 2013) ........................................................................ 13

*Jackson v. Heh*,
    215 F.3d 1326 (6th Cir. 2000) .............................................................................. 26

*Kartseva v. Dep't of State*,
    37 F.3d 1524 (D.C. Cir. 1994) ............................................................................. 25

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 29

*Mead Johnson Pharm. Grp. v. Bowen*,
    655 F. Supp. 53 (D.D.C. 1986), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988) .................. 30

*Mey v. DIRECTV, LLC*,
    971 F.3d 284 (4th Cir. 2020) ................................................................................ 19

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 15, 21

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ............................................................................. 23

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) ........................................................................ 32

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................... 13, 35

*O'Bannon v. Town Court Nursing Ctr.*,
    447 U.S. 773 (1980) .................................................................................... 24, 25

*Orange v. Dist. of Columbia*,
    59 F.3d 1267 (D.C. Cir. 1995) ............................................................................. 26

*Orvis v. Brownell*,
    345 U.S. 183 (1953) ............................................................................................. 5

*Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................... 32

*Propper v. Clark*,
    337 U.S. 472 (1949) ............................................................................................. 5

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ................................................. 23

*Regan v. Wald*,
    468 U.S. 222 (1984) ...................................................................... 5

*Ridder v. Office of Thrift Supervision*,
    146 F.3d 1035 (D.C. Cir. 1998) ............................................... 25

*Rodriguez v. Margotta*,
    71 F. Supp. 2d 289 (S.D.N.Y. 1999) ....................................... 27

*Sampson v. Murray*,
    415 U.S. 61 (1974) ...................................................................... 30

*Servs., Inc. v. Resolution Econ., LLC*,
    140 F. Supp. 3d 47 (D.D.C. 2015) ........................................... 32

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ........................................... 13

*Small Refin. Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ................................................. 20

*Taylor v. Resolution Trust, Co.*,
    56 F.3d 1497 (D.C. Cir. 1995) ................................................. 26

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003) .................................. 25,2 6, 27

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ................................................. 29

*Uthman v. Trump*,
    486 F. Supp. 3d 350 ................................................................... 22

*Verma v. U.S. Citizenship & Immigration Serv..*,
    No. 20-cv-3419 (RDM), 2020 WL 7495286 (D.D.C. Dec. 18, 2020) ...................................... 29

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................... 29

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................... 13, 36

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 31, 32, 34

*Xiaomi Corporation v. Department of Defense*,
  No 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021)............................................ *passim*

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
  750 F. Supp. 2d 150 (D.D.C. 2010) ......................................................................... 15

*Zevallos v. Obama*,
  10 F. Supp. 3d 111 (D.D.C. 2014) ..................................................................... 15, 20, 22

## STATUTES

5 U.S.C. § 706 ....................................................................................................... 22

22 U.S.C. § 7002(b)(2) ........................................................................................... 4

50 U.S.C. § 1701(a) ................................................................................................ 6

50 U.S.C. §§ 1701-1706 ......................................................................................... 5

50 U.S.C. § 4305(b)(1) ........................................................................................... 5

Pub. L. No. 105-261 ............................................................................................. 3, 7

Pub. L. No. 106-398 ............................................................................................. 4, 8

Pub. L. No. 107-56 ................................................................................................ 7

Pub. L. No. 108-375 .............................................................................................. 8

Pub. L. No. 109-163 ............................................................................................. 19

Pub. L. No. 116-283 ............................................................................................. 4

## REGULATIONS

32 C.F.R. § 117.3 ................................................................................................. 19

32 C.F.R. § 323.3 ................................................................................................. 19

48 C.F.R. § 225.003 ............................................................................................. 19

48 C.F.R. § 225.770 ............................................................................................. 19

**EXECUTIVE ORDERS**

Addressing the Threat from Securities Investments That Finance Communist Chinese Military
Companies,
Exec. Order ("E.O.") No. 13959, 85 Fed. Reg. 73185 (Nov. 17, 2020) ("E.O. 13959")... *passim*

Amending Executive Order 13959_Addressing the Threat From Securities Investments That
Finance Communist Chinese Military Companies,
Exec. Order No. 13974 § 1, 86 Fed. Reg. 4875 (Jan. 19, 2021) ................................................. 1

Blocking Assets & Prohibiting Transactions with Significant Narcotics Traffickers,
Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995)...................................................... 6

Blocking Property of Additional Persons Contributing to the Situation in Ukraine,
Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014)..................................................... 6

**OTHER AUTHORITIES**

H. Rep No. 108-491 ......................................................................................................................... 20

S. Rep. No. 95-466 (1977),
*reprinted in* 1977 U.S.C.C.A.N. 4540, 4541, codified at 50 U.S.C. §§ 1701-1706.................... 5

Merriam-Webster, affiliated (adj.), https://www.merriam-
webster.com/dictionary/affiliated#learn-more .......................................................................... 18

*Military-Civil Fusion and the People's Republic of China*, U.S. Department of State,
https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-
One-Pager.pdf ...................................................................................................................... 16, 17

OED, affiliated (adj.), https://www.oed.com/view/Entry/3404?rskey=CNrhfW&
result=2&isAdvanced=false#eid ......................................................................................... 18, 29

Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs.
Involving the PRC, https://china.usc.edu/sites/default/files/article/attachments/2011_
CMPR_Final.pdf ........................................................................................................................ 4

Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the
PRC (2020), https://media.defense.gov/2020/Sep/01/2002488689/-1/-1/1/2020-DOD-CHINA-
MILITARY-POWER-REPORT-FINAL.PDF ........................................................................... 4

Qualifying Entities Prepared in Response to Section 1237 of the National Defense Authorization
Act for Fiscal Year 1999 (PUBLIC LAW 105-261),
https://media.defense.gov/2021/Jan/14/2002565154/-1/-1/0/DOD-RELEASES-LIST-OF-

ADDITIONAL-COMPANIES-IN-ACCORDANCE-WITH-SECTION-1237-OF-FY99-
NDAA.PDF ................................................................................................................. 10

Remarks by President Biden on America's Place in the World (Feb. 4, 2021),
https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-
by-president-biden-on-americas-place-in-the-world .................................................................. 5


The U.S.-China Economic and Security Review Commission, 2018 Annual Report, – Emerging
Technologies and Military-Civil Fusion: Artificial Intelligence, New Materials, and New
Energy, https://www.uscc.gov/sites/default/files/2019-11/
Chapter%203%20Section%202%20-%20Emerging%20Technologies%
20and%20Military-Civil%20Fusion%20-%20Artificial%20Intelligence,%20New%
20Materials,%20and%20New%20Energy.pdf ..................................................................... 4, 17

## INTRODUCTION

For over two decades, Congress and the President have been concerned about the interactions between nominally independent Chinese corporations and the Chinese government and military.  Since 1999, Congress has directed the President to identify certain entities as Communist Chinese military companies ("CCMCs") and authorized the President to impose sanctions against those entities.  Last year, in addition to the long-established Congressional acknowledgement of the threat posed by CCMCs, the President independently found that the People's Republic of China's ("PRC's") "military-industrial complex" "constitutes an unusual and extraordinary threat . . . to the national security, foreign policy, and economy of the United States" "by directly supporting the efforts of the PRC's military, intelligence, and other security apparatuses."  Addressing the Threat from Securities Investments That Finance Communist Chinese Military Companies, Exec. Order ("E.O.") No. 13959, 85 Fed. Reg. 73185 (Nov. 17, 2020) ("E.O. 13959").

The President directed that U.S. persons were forbidden to transact in publicly traded securities of companies listed as "Communist Chinese military companies" sixty days after the Secretaries of Defense or Treasury made such a listing determination.  *Id.* §§ 1, 4(a).  The President subsequently amended E.O. 13959 to require U.S. persons to fully divest such securities one year after said listing.  E.O. No. 13974 § 1, 86 Fed. Reg. 4875 (Jan. 19, 2021).  On January 14, the Department of Defense ("DoD") initially listed Plaintiff Luokung as a CCMC.  DoD took this measure based on the company's formal partnership agreements with state-owned entities, activities in traditional sectors of the defense industrial base, and design and employment of critical technologies for modern military purposes, all indications that it was affiliated with the Chinese defense industrial base.  (On March 9, 2021, DoD de-listed an entity called "Luokong Technology

1

Corporation" and re-listed the entity called "Luokung Technology Corp," fixing an error in the company's name, and resetting the clock for when the restrictions would come into effect.)

This case presents the narrow question of whether Luokung was properly listed as a CCMC pursuant to the specific requirements of E.O. 13959, as amended.  Plaintiffs, Luokung itself and two individual shareholders, bring suit, asserting that the Government's activities violate the Administrative Procedure Act and the Due Process Clause, and that they are thus entitled to a preliminary injunction.  They cannot make the showings required for that relief.  With respect to the APA claim, DoD's listing was rational and supported by evidence.  And its activities comported with due process: Luokung cannot show a liberty interest in issuing publicly traded securities to certain people, or having publicly traded securities possessed by certain people, nor can the individual plaintiffs show a property right in future transactions of Luokung securities. Absent such a liberty interest or property right, there can be no due process violation.  And even to the extent that the individual plaintiffs will be required to divest their currently held securities in 2022, such injury is not "imminent" as is required for preliminary relief.

Nor can Plaintiffs demonstrate irreparable injury.  Their claims of injury are essentially economic.  But economic injury, even against the Government, reflects harm for which there is quintessentially a remedy at law; such injury must be severe, if not threatening the existence of the entity to warrant injunctive relief.  Plaintiffs cannot make such a showing.  Moreover, the balance of the equities are in favor of the Government particularly where both Congress and the President have recognized the grave national security interests that are at stake.

This Court recently addressed similar issues in the related case, *Xiaomi Corporation v. Department of Defense*, No 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021).   The Government respectfully submits that this proceeding presents a stronger factual basis for a CCMC

determination than in *Xiaomi*, and can be factually distinguished from *Xiaomi* with respect to both the merits and the other injunction factors. The Government recognizes, however, that should this Court disagree, and conclude that the factual record here is not materially distinguishable from *Xiaomi*, then the reasoning presented in Court's previous decision will likely support the entry of a preliminary injunction here as well.

## **BACKGROUND**

## I.   **Longstanding United States Concerns Over Chinese Military-Civil Integration**

The United States Government has long expressed significant concerns over the national security threat posed by the interrelationship between Chinese technology companies and the Chinese state. In the FY 1999 National Defense Authorization Act ("NDAA"), Congress directed the President to identify entities that meet the statutory definition of CCMCs, and has authorized the President to issue IEEPA sanctions against them even without a declaration of national emergency. *See* National Defense Authorization Act for FY 1999 ("FY99 NDAA"), § 1237(a), b), Pub. L. 105-261, 112 Stat. 2160 (Oct. 17, 1998). In 2005, Congress expanded the definition of CCMC because the then-existing definition, which depended on the company's relationship to the Chinese People's Liberation Army, "exclud[ed] a class of firms engaged in Chinese military modernization." H. Rep. No. 108-491 at 367.

This concern has continued into this decade. For example, in its 2011 Annual Report to Congress, the Department of Defense acknowledged that "China's defense industry has benefited from integration with a rapidly expanding civilian economy and science and technology sector, particularly elements that have access to foreign technologies." Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the PRC, at 42 (2011) ("2011 DoD Annual

Rep.").[1]   "Information technology companies in particular . . . maintain close ties to the [People's Liberation Army]."   *Id.*   A decade later, these concerns had not changed, with DoD recognizing that China's strategy seeks to "fuse[] . . . China's defense industrial base and its civilian technology and industrial base."   Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the PRC, at 18 (2020) ("2020 DoD Annual Rep.").[2]   The U.S.-China Economic and Security Review Commission ("U.S.-China Commission")[3] has articulated similar concerns, noting that "[t]he Chinese government's military–civil fusion policy aims to spur innovation and economic growth through an array of policies . . . while leveraging the fruits of civilian innovation for China's defense sector."   *See* U.S.-China Economic & Security Review Comm'n, 2018 Annual Report, Chap. 3 § 2 – Emerging Technologies and Military-Civil Fusion: Artificial Intelligence, New Materials, and New Energy ("U.S. China Comm'n 2018 Rpt.").[4]

These concerns animate current bipartisan policy, including the National Defense Authorization Act for FY 2021 ("FY21 NDAA"), where Congress required the Secretary of Defense to publicly identify "Chinese military compan[ies]."   *See* FY21 NDAA § 1260H, Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (2021).   The current administration's views are consistent

---

[1] *Available at:* https://china.usc.edu/sites/default/files/article/attachments/ 2011_CMPR_Final.pdf

[2] https://media.defense.gov/2020/Sep/01/2002488689/-1/-1/1/2020-DOD-CHINA-MILITARY-POWER-REPORT-FINAL.PDF.

[3] The U.S.-China Commission, established by statute in the 2001 NDAA, Pub. L. No. 106-398, 114 Stat. 1654 (2000), is intended "to monitor, investigate, and report to Congress on the national security implications of the bilateral trade and economic relationship between the United States and the People's Republic of China [PRC]."   22 U.S.C. § 7002(b)(2).

[4] https://www.uscc.gov/sites/default/files/2019-11/Chapter%203%20Section%202%20-%20Emerging%20Technologies%20and%20Military-Civil%20Fusion%20-%20Artificial%20Intelligence,%20New%20Materials,%20and%20New%20Energy.pdf.

with this approach, which represents more than two decades of concern among the Legislative and Executive Branches over this issue. *Cf. generally* Remarks by President Biden on America's Place in the World (Feb. 4, 2021)[5]; *see also* FY99 NDAA § 1237(b) (embodying similar concern about CCMCs).

## II.     Statutory Background

### A.     Historical Overview

For nearly its entire history, the United States has utilized economic sanctions as a tool in its foreign policy and national security arsenals. During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 *et seq*.). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. *See* 50 U.S.C. § 4305(b)(1); *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). TWEA conveyed to the Executive Branch the authority to regulate, prevent, or prohibit transactions, which has been consistently interpreted to encompass the power to block or freeze a person's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

### B.     International Emergency Economic Powers Act ("IEEPA")

In 1977, Congress amended TWEA and enacted IEEPA. *See* S. Rep. No. 95-466, at 2 (1977), reprinted in 1977 U.S.C.C.A.N. 4540, 4541, codified at 50 U.S.C. §§ 1701-1706. IEEPA extended the President's authority to declare national emergencies, while TWEA's application was limited to periods of declared wars. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although

---

[5] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-by-president-biden-on-americas-place-in-the-world/.

the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).   Once such a national emergency is declared, IEEPA authorizes the President to:

> [D]irect and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, Presidents have designated persons under sanctions programs based on IEEPA in response to a variety of declared national emergencies.  *See, e.g.*, Blocking Property of Additional Persons Contributing to the Situation in Ukraine, Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014) (blocking assets of persons determined "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation" after finding that government's actions and policies with respect to Ukraine "constitute an unusual and extraordinary threat to the national security and foreign policy of the United States"); Blocking Assets & Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia").

In October 2001, Congress amended IEEPA through passage of the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.  Among other things, the amendments provided that, in case of judicial

review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera."  *See* 50 U.S.C. § 1702(c), added by Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

    **C.**    **Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, as Amended**

Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, as amended, authorizes the President to exercise IEEPA authorities against "Communist Chinese military companies" without the need for a declaration of national emergency that is typically required for IEEPA regulation.  *See* NDAA, FY99 § 1237(a)(1), Pub. L. No. 105-261, 112 Stat. 1920, 2161 (1998).  The NDAA requires the Secretary of Defense to "make a determination of those persons operating directly or indirectly in the United States or any of its territories and possessions that are Communist Chinese military companies[.]"  *Id.* § 1237(b)(1).  This provision also requires the Department of Defense to publish a list of those persons in the Federal Register, and make annual revisions to the list.  *Id.* at § 1237(b)(2).  When formulating the list, the Department of Defense must consult with the Attorney General, the Director of Central Intelligence, and the Director of the Federal Bureau of Investigation.  *Id.* at § 1237(b)(3).  Further, the Department of Defense must provide this list to the Committee on Armed Services of the U.S. House of Representatives, the Committee on Armed Services of the U.S. Senate, the Secretary of State, the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Secretary of Energy, and the Director of the Central Intelligence Agency.  *Id.* at § 1237(b)(1).

As amended, Section 1237 defines the term "Communist Chinese military company," in relevant part, as any person that "(i) is owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China or that is owned or controlled by an entity affiliated with the defense industrial base of the People's Republic

of China; and (ii) is engaged in providing commercial services, manufacturing, producing, or exporting."  NDAA, FY99 § 1237(b)(4)(B), as amended by Pub. L. No. 106-398 § 1233 and Pub. L. No. 108-375 § 1222.  The statutory provision also defines "People's Liberation Army" as "the land, naval, and air military services, the police, and the intelligence services of the Communist Government of the People's Republic of China, and any member of any such service or of such police."  *Id.* at § 1237(c).

On June 24, 2020, the Department of Defense designated twenty companies as CCMCs. The agency listed fifteen additional companies pursuant to Section 1237 on August 28, 2020, and December 3, 2020.  And on January 14, 2021, DoD made its most recent listing, which included Luokung.

### D.      Executive Order No. 13959, as Amended

On November 12, 2020, the President declared a national emergency under IEEPA addressing the threat posed by securities investments in the United States by companies linked to the military of the People's Republic of China.  *See* E.O. 13959.  The President explained that the PRC "is increasingly exploiting United States capital to resource and to enable the development and modernization of its military, intelligence, and other security apparatuses, which continues to allow the PRC to directly threaten the United States homeland and United States forces overseas[.]"  *Id.*  "Through the national strategy of Military-Civil Fusion, the PRC increases the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities."  *Id.*  To support these efforts, "[t]hose companies raise capital by selling securities to United States investors that trade on public exchanges both here and abroad, . . . [and] the PRC exploits United States investors to finance the development and modernization of its military."  *Id.*

By issuing E.O. 13959, the President prohibited any United States person from engaging in certain investment activities with any CCMC.  In particular, Section 1(a)(i) of E.O. 13959 prohibited U.S. persons from engaging in any "transaction in publicly[-]traded securities, or any securities that are derivative of, or are designed to provide investment exposure to such securities, of any Communist Chinese military company as defined in section 4(a)(i) [of the E.O.]."  Further, Section 1(a)(ii) of E.O. 13959 prohibited U.S. persons from engaging in the same conduct within 60 days of a later determination that an entity satisfies the definition of Communist Chinese military company, as defined in E.O. 13959.  Notwithstanding these prohibitions, Sections 1(b) and 1(c) permitted U.S. persons to engage in purchases for value or sales for 365 days after the issuance of E.O. 13959 or the date on which the entity met the definition of a CCMC.

Section 4(a) of E.O. 13959 defines the term "Communist Chinese military company." Pursuant to Section 4(a)(i), the term includes "any person that the Secretary of Defense has listed as a Communist Chinese military company operating directly or indirectly in the United States or in any of its territories or possessions pursuant to [S]ection 1237 . . . as of the date of this order, and as set forth in the Annex to this order . . . ."  Further, under Section 4(a)(ii), as amended, the definition includes any person subsequently determined by the Secretary of Defense, in consultation with the Secretary of the Treasury, to be a "Communist Chinese military company meeting the criteria in [S]ection 1237(b)(4)(B) . . . and that operates directly or indirectly in the United States or in any of its territories or possessions."

On January 13, 2021, the President issued Executive Order No. 13974, 86 Fed. Reg. 4875 (Jan. 19, 2021), which, in addition to certain technical edits, amended E.O. 13959 to (1) expressly require U.S. persons to fully divest the covered securities of a CCMC within 365 days of that CCMC's public listing; (2) expand the definition of "transaction" to include "sales," in addition to

9

"purchases for value"; and (3) make clear that the definition of CCMCs set out by Section 1237 applied even after the separate Congressional reporting provision of that NDAA no longer had effect.

### III.   Factual Background and Procedural History

On January 14, 2021, the Department of Defense submitted a Section 1237 list to Congress identifying Luokung as a CCMC.  *See* "Qualifying Entities Prepared in Response to Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 (PUBLIC LAW 105-261)."[6]  In light of the further developments described below, the prohibitions set forth in E.O. 13959 will take effect with respect to Luokung on May 8, 2021.  *See* E.O. 13959, § 1(a)(ii).

Plaintiff Luokung filed this lawsuit on March 4, 2021.  *See* Complaint ("Compl."), ECF No. 1.  The lawsuit was amended on March 23, 2021.  *See* First Am. Compl. ("Am. Compl."), ECF No. 22.  According to the Complaint, Plaintiff Luokung is a publicly-traded, technology company headquartered in China and incorporated in the British Virgin Islands.  *Id.* at ¶ 11. Plaintiff Luokung "offers a broad range of products and location-based services for civilian and commercial use, including map software and services and cloud platform software."  *Id.* at ¶ 1. Plaintiff Luokung alleges that its shares are exclusively traded in the United States on the Nasdaq. *Id.* ¶¶ 21, 23.  Plaintiff Luokung also claims that it has thousands of U.S. shareholders, including some of its "top-10 current largest shareholders[.]"  *Id.* at ¶ 22.  The Complaint asserts that Plaintiff Luokung "has raised approximately $190 million, of which over $100 million came from U.S. institutional investors or through U.S. financial institutions."  *Id.* at ¶ 23.  Further, the Complaint alleges that Plaintiff Baomin Li is a United States citizen, lives in the United States, and serves as

---

[6] https://media.defense.gov/2021/Jan/14/2002565154/-1/-1/0/DOD-RELEASES-LIST-OF-ADDITIONAL-COMPANIES-IN-ACCORDANCE-WITH-SECTION-1237-OF-FY99-NDAA.PDF.

the Chief Technology Officer for Luokung.  *Id.* at ¶ 25.  Plaintiff Baomin Li allegedly owns 1,000,000 ordinary shares of Luokung.  *Id.* at ¶ 12.  He has also purportedly been a beneficiary of the Luokung employee incentive plan, "which regularly awards, among others, stock options, stock appreciation rights ("SARs"), restricted stock, restricted stock units, and unrestricted stock as significant forms of compensation to its employees."  *Id.*  According to the Complaint, Plaintiff Raymond Weiman Bai is also a United States citizen, an employee of Luokung, and the owner of 540,000 ordinary shares of Luokung.  *Id.* at ¶ 13.

The Complaint asserts six claims.  *See* Compl. at ¶¶ 68-103.  First, Plaintiffs allege that Defendants violated the APA by arbitrarily and capriciously designating Plaintiff Luokung.  *Id.* at ¶¶ 68-74.  Plaintiffs contend that the Department of Defense acted arbitrarily because it could not have any accurate evidence that Plaintiff Luokung satisfied the definition of a CCMC, and it "failed to articulate a reasonable explanation for their decision."  *Id.* at ¶ 73.  Second, Plaintiffs assert that Defendants violated the APA "[t]o the extent that the Department of Defense failed to comply" with the requirement in Section 1237 that it consult with the Attorney General, the Director of the Central Intelligence Agency, and the Director of the Federal Bureau of Investigation prior to listing Plaintiff Luokung.  *Id.* at ¶¶ 75-81.  Third, Plaintiffs allege that the Department of Defense's listing of Plaintiff Luokung is ultra vires "both because Luokung fails to qualify for such designation under the criteria of Section 1237 and/or because the DoD did not consult with the other agencies" as required by Section 1237.  *Id.* at ¶¶ 82-85.  Fourth, Plaintiffs contend that the prohibitions in E.O. 13959 as applied to Plaintiff Luokung will be ultra vires because the corporation does not meet the definition of a CCMC in Section 1237.  *Id.* at ¶¶ 86-89.  Fifth, Plaintiffs assert that Defendants' designation of Luokung as a CCMC without notice or opportunity to be heard has deprived Plaintiffs of a property and liberty interest without due process in violation of the Fifth

Amendment of the U.S. Constitution.  *Id.* at ¶¶ 90-97.  Plaintiffs specifically argue that the prohibitions set forth in E.O. 13959, among other things, limit Plaintiff Luokung's "rights to access U.S. capital markets, its relationships with shareholders, financial institutions, . . . and other members of the public[.]"  *Id.* at ¶ 93.  Plaintiffs also contend that the prohibitions in E.O. 13959 deny the individual plaintiffs "their ability to transact in or possess Luokung's securities."  *Id.* at ¶ 94.  Plaintiffs argue that they did not receive any notice prior to Plaintiff Luokung's listing, and they have neither been provided the factual basis for the listing nor afforded a process by which Luokung can challenge the listing.  *Id.* at ¶ 95.  Sixth, Plaintiffs claim that the term "affiliated with" in Section 1237 is unconstitutionally vague and therefore violates the Due Process Clause of the Fifth Amendment.  *Id.* at ¶¶ 98-103.

Plaintiffs filed a motion for a temporary restraining order on March 5, 2021, arguing they were likely to succeed on the merits of their APA and due process claims.  *See generally* Mem. Supp. Pls.' Mot. for TRO, ECF No. 9-1.

On March 9, 2021, the Secretary of Defense stated publicly that "[d]ue to a transliteration, Luokung Technology Corp was incorrectly listed as Luokong Technology Corporation."  Motion to Vacate TRO Schedule, Ex. A, ECF No. 15-1.  The next day, the Acting Director of the Office of Foreign Asset Control confirmed that "[the prohibition in section 1(a)(ii) of E.O. 13959 will take effect with respect to Luokung Technology Corp (LKCO) 60 days after March 9, 2021 (i.e., May 8, 2021), and the prohibition in section 1(c) of E.O. 13959 will take effect with respect to Luokung Technology Corp (LKCO) 365 days after March 9, 2021 (i.e., March 9, 2022).  *Id.*, Ex. B., ECF No. 15-2.  Plaintiffs filed their motion for a preliminary injunction on April 2, 2021.  *See generally* Pls.' Mem. Supp. Mot. Prelim. Inj ("Pls.' Mem."), ECF No. 26.1

## **STANDARD OF REVIEW**

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  A party moving for a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'"  *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  When, as here, the Government is opposing a motion for a preliminary injunction, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[7]

## ARGUMENT

Plaintiffs are not entitled to the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 22.  To begin, they have not demonstrated that they are likely to succeed on their claims.  With respect to their APA claim, Defendants are entitled to significant deference regarding DoD's listing determination which, in any event, is rational and rooted in evidence that

---

[7] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)."  *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted). In any event, regardless of which standard is applied, preliminary relief is inappropriate here.

Luokung is affiliated with the Chinese military and defense establishment.  Nor have Defendants violated the Constitution's Due Process Clause.  Luokung cannot show that it has a liberty interest in offering securities on the open-market, or in choosing who may possess such publicly-traded securities.  The individual plaintiffs have not established a property right to possessing *future* Luokung securities, something they will no longer be able to do after March 15; at best, they have a property interest in their current shares, but they need not sell those shares until next year, and thus any injury would not be imminent as is required for preliminary relief.  Nor is any harm irreparable—rather, it is largely economic or speculative.  Finally, the public interest supports the President's ability to take steps to mitigate a national emergency, as Defendants have done here.

## I.     Plaintiffs Are Not Likely To Succeed on Their Administrative Procedure Act Claims.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  As relevant here, a court should uphold an agency decision unless it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"   5 U.S.C. § 706(2)(A).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id.*  Rather, the agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*; *see also Zevallos v. Obama* 10 F. Supp. 3d 111, 118-19 (D.D.C. 2014).

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs.  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential.").  The Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  Cases involving sanctions are no exception.  *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.") , *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

In assessing that Luokung meets Section 1237's statutory criteria, DoD considered multiple facts about the company indicating its close relationship to PRC affiliated entities.  DoD recounted that Luokung has established a partnership with a Chinese State-Owned Enterprise "to provide cooperation on digital city construction, smart city data operation," and other smart city initiatives, together demonstrating a "close affiliation with the PRC and potential affiliation with the

surveillance capabilities of the PRC National Police."  Luokung Decisional Memo ("DoD Mem."), ECF No. 22-7.  It further found that Luokung has entered a strategic cooperation agreement with the China National Geospatial Information Center, an institution under a PRC government agency, the National Development and Reform Commission.  *Id.* at 1.  This agreement involves the joint development of various products and policies "intended to promote the wide application of geospatial information data and technical services in spatial planning, e-government, smart-city, smart ecology, and smart agriculture."  *Id.* at 2.  The agreement demonstrates further "close affiliation with the main body of PRC economic regulation and planning and potential affiliation with the surveillance capabilities of the PRC National Police."  And DoD also found that a wholly owned subsidiary of Luokung has established comprehensive cooperation with Huawei Investment & Holding Co., Ltd., another CCMC.  *Id.* at 2.  Altogether, these facts showed numerous instances of affiliation between Luokung and the Chinese State.

DoD also considered facts about Luokung's investment priorities in light of the PRC's pursuit of the Military-Civil Fusion concept.  "Military-Civil Fusion," as defined by the U.S. Department of State, "is an aggressive, national strategy of the Chinese Communist Party (CCP) . . . . [whose] goal is to enable the PRC to develop the most technologically advanced military in the world."  *See Military-Civil Fusion and the People's Republic of China*, U.S. Department of State ("State Dep't. MCF").[8]  "[A] key part of [Military-Civil Fusion] is the elimination of barriers between China's civilian research and commercial sectors, and its military and defense industrial sectors."  *Id.*  "[I]n practice, [Military-Civil Fusion] means that there is not a clear line between the PRC's civilian and military economies."  2020 DoD Annual Rep. at vi.

---

[8] https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-One-Pager.pdf.

This strategy involves "fusing . . . China's defense industrial base and its civilian technology and industrial base." *Id.* at 18.  China's Military-Civil Fusion strategy contributed directly to the national emergency declared in E.O. 13959.  *See* E.O. 13959 ("Through the national strategy of Military-Civil Fusion, the PRC increases the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities.").[9]

DoD found that Luokung is investing heavily in space technologies, such as "measurement and control systems for rockets, satellites and earth stations," and in Artificial Intelligence (AI) and Autonomous Systems.  DoD Mem., at 1.  These technologies are of key interest to the PRC, and are a focus of the Military-Civil Fusion strategy.  *See* U.S. China Comm'n  2018 Rpt. at 220 ("China's strategists see AI as a force multiplier across systems, a potential asymmetric advantage against high-value conventional weapons systems, and even a harbinger of a new mode of combat, where superior algorithms prove operationally decisive."); State Dep't. MCF ("Key technologies being targeted under MCF include . . . aerospace technology, and AI.  The PRC specifically seeks to exploit the inherent 'dual-use' nature of many of these technologies, which have both military and civilian applications.").

The combination of these factors—(1) the numerous strategic partnerships between Luokung and PRC-affiliated entities; and (2) active engagement and investment by Luokung in technologies core to the PRC's Military-Civil Fusion strategy—when considered in the context of the Military-Civil Fusion strategy itself, which eliminates barriers between the commercial and

---

[9] For the purposes of this opposition, Defendants are not claiming that these specific materials, other than the memorandum attached as ECF No. 22-7, went before the decision-maker. The D.C. Circuit has, however, accepted extra-record materials, if, as here, "background information was needed 'to determine whether the agency considered all the relevant factors.'" *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).

defense sectors, especially with regards to the technologies at issue here, are adequate to support DoD's finding that Luokung is "affiliated with the [PLA], government ministries of the [PRC], or . . . the PRC defense industrial base."  DoD Mem., at 1.

Plaintiffs contest DoD's finding by arguing that the statute's use of the term "affiliated with" is limited to business relations akin to ownership or control.  *See* Pls.' Mem. at 24-26.  But even applying something akin to that definition, DoD's determination is supported here.  As discussed above, DoD relied upon the fact of a strategic partnership between Luokung and a Chinese State Owned Enterprise and another with an institution within a PRC agency.  DoD Mem., at 1–2.  Although these facts may not demonstrate literal ownership of Luokung by these government-owned or controlled entities, they nonetheless demonstrate a working, formalized relationship between Luokung and the PRC far beyond what the record reflected in *Xiaomi*.  Indeed, even as it argues that DoD's determination was not supported by substantial evidence, Luokung explains that it does in fact have a "cooperation agreement" with a Chinese "government institution" for the purpose of providing "mapping and other services in support" of various government functions.  Pls.' Mem. at 30.

Additionally, Defendants respectfully maintain their position that the term "affiliated with" should not be so narrowly construed as Plaintiffs urge.  Defendants recognize that in *Xiaomi* this Court agreed with and adopted that construction of the statute.  *See Xiaomi*, 2021 WL 950144, at *6–7.  Nonetheless, a broader definition of "affiliated with" is warranted, given that the term's ordinary definition readily encompasses associations "on the basis of a common purpose or of shared characteristics."  *See* OED, affiliated (adj.);[10] *see also* Merriam-Webster, affiliated (adj.)

---

[10] https://www.oed.com/view/Entry/3404?rskey=CNrhfW& result=2&isAdvanced=false#eid.

("closely associated with another typically in a dependent or subordinate position").[11]  Moreover, the authority that Plaintiffs relied upon in *Xiaomi*, as here, concerned the definition of **affiliate**, *i.e.*, the noun form of the word, not the adjectival phrase.  *See, e.g.*, Pls.' Mem. at 25 (citing *Mey v. DIRECTV, LLC*, 971 F.3d 284, 289 (4th Cir. 2020) (quoting Webster's Third New Int'l Dictionary 35 (2002) (defining "affiliate")).  So too did *Emory Univ. v. Neurocare, Inc.*, 985 F.3d 1337, 1343-44 (11th Cir. 2021) (defining "affiliate"), which the *Xiaomi* court relied upon.  *See Xiaomi*, 2021 WL 950144, at *7.  But Congress did not use the phrase "owned, controlled, or an affiliate of," it used "affiliated with," which suggests a broader reading.

Moreover, while the *Xiaomi* court noted that "the Department of Defense's own regulations use a definition [of "affiliate"] substantially similar to Plaintiff's definition," *id.* (citing 32 C.F.R. § 323.3; 32 C.F.R. § 117.3), DoD has more relevant regulations that specifically address the CCMC definition, including the proper construction of "affiliated with."  Specifically, the Department of Defense's Defense Acquisition Regulation System applies a broad definition of "Communist Chinese military company," which includes, *inter alia*, "any entity, regardless of geographic location, that is – (1) A part of the commercial or defense industrial base of the People's Republic of China (including a subsidiary or affiliate of such entity)," 48 C.F.R. § 225.003.  This definition was put forward as part of a provision to "implement[] section 1211 of the [FY 2006 NDAA, Pub. L. 109-163]," which prohibits certain acquisitions from Communist Chinese military companies.  48 C.F.R. § 225.770; *see also* 48 C.F.R. § 252.225-7007.  That NDAA provision, in term, incorporated by reference section 1237's definition of CCMC, as amended.  *See* Pub. L. No. 109-163 § 1211(d)(1).  Such a regulatory definition indicates that the Department of Defense, at

---

[11] https://www.merriam-webster.com/dictionary/affiliated#learn-more.

least when it comes to the definition of "affiliated with" as part of section 1237's CCMC definition specifically, appropriately uses a broad definition of term, even if the Department's use of the noun "affiliate" in other contexts may be narrower.  Indeed, legislative history supports the view that the current definition of CCMC is intended to use a relatively broad conception of "affiliated with" that is not solely limited to corporate structure.  *See* H. Rep. No. 108-491, Rpt. of the Comm. on Armed Services, House of Representatives, on H.R. 4200, at 366 (FY05 NDAA was intended to "expand the definition of a "Communist Chinese military company," as defined in [the FY99 NDAA] to include Chinese firms owned or operated by a ministry of the People's Republic of China *or an entity affiliated with the defense industrial base of the People's Republic of China*.") (emphasis added)

Moreover, the narrower construction would render "affiliated" largely superfluous to the statute's separate criteria concerning ownership and control.  Further, the narrower definition would fail to address the threat posed by Military-Civil Fusion that Congress was attempting to address because, under that construction, as long as a ministry of the PRC government did not directly assert financial ownership over a civil corporation, the corporation would be immune from sanction, regardless of its level of cooperation with the PRC military.  That outcome was clearly not the intent of Congress when it chose to use the term "or affiliated with" in addition to "owned or controlled."

In sum, DoD's decision satisfies the highly deferential APA standard that the Court must apply here.  *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining that a court must uphold agency's sanctions-related decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'" (citation omitted)); *Holy Land Found.*, 219 F. Supp. 2d at 74 (decision must be affirmed if it "meets the 'minimal standards of rationality'") (quoting *Small Refin. Lead Phase-*

*Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)).  DoD's listing decision was rational and supported by substantial evidence.[12]

Plaintiffs also fault DoD for failing to adequately explain its decision.  *See* Pls.' Mem. at 22-24.  Plaintiffs principally rely on this Court's decision in *Xiaomi*, which faulted DoD for not "connecting the facts to the conclusion" that the company in that case met the statutory criteria of a CCMC.  *Xiaomi*, 2021 WL 950144, at *5.  Defendants submit, however, that the Court's decision in *Xiaomi* as to the lack of a reasoned explanation cannot be divorced from the comparatively thinner record supporting that decision.  Here, DoD has pointed to the existence of cooperation agreements with Chinese government owned or controlled entities, something that on its face shows the existence of affiliation with the PRC.  And DoD relied on these particular facts in concluding that the statute's criteria were met.  The APA's burdens are not extensive: a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Ark.-Best Freight System*, 419 U.S. 281, 286 (1976)).  Here, it is clear from context that DoD was relying on the "affiliated with" prong of section 1237, and by highlighting facts indicating formal agreements between the company and the Chinese State, DoD made clear it viewed these facts as articulating the statutory connection.  Indeed, Plaintiffs appear to understand that this was the structure of DoD's reasoning; they take issue with it, of course, but they do not seriously doubt the basis for the agency's determination.  *See* Pls.' Mem. at 24-31.  DoD accordingly met its modest burden to establish a "rational connection between the facts found and the choice made."  *Id.*

---

[12] At a minimum, Plaintiffs' APA claim against the President is not likely to succeed, since the President's actions are not subject to the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

As for the asserted misstatement of the statutory standard, Pls.' Mem. at 23-24, no relief is warranted on that basis in light of the rule of harmless error.  *See* 5 U.S.C. § 706 (requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial error.").  As discussed, the President's Executive Order demonstrated the pivotal national security importance of combating Chinese Military-Civil Fusion, *see* E.O. 13959, and DoD found Luokung was a CCMC in light of evidence indicating the company's role in that fusion, Pahutski Decl., Ex A.  Given the totality of evidence before the agency and the fact that it meets the statute as enacted, any error as to DoD's description of the statute would be harmless and therefore insufficient to warrant the relief Luokung seeks.  The deferential standards of the APA in the national security context require no more.  *See Zevallos*, 10 F. Supp. 3d at 123 n.9; *Holy Land Found.*, 219 F. Supp. 2d at 74.[13]

## II.    Plaintiffs Are Not Likely To Succeed on Their Due Process Claim.

Plaintiffs are not likely to succeed on their due process claim.  However, should this Court conclude that Plaintiffs are likely to succeed on their APA claim, it should not reach the due process claims, which raise novel questions about the scope of property and liberty interests in these contexts.  Such an action follows from the instructions originally laid out by Justice Brandeis in his *Ashwander* concurrence, where "he suggested as a matter of judicial restraint and 'governance,' courts generally should endeavor to resolve cases on non-constitutional grounds and should entertain constitutional questions only when necessary."  *Uthman v. Trump*, 486 F. Supp. 3d 350, 356 (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J.,

---

[13] Plaintiffs also claim that DoD violated the APA by failing to engage in consultation required under the FY99 NDAA.  *See* Pls.' Mem. at 32-33.  But such an argument is premature in the preliminary injunction context, before the agency has produced the full administrative record. That is particularly so in light of the fact that "the evidence needed will vary depending on the context, especially the extent to which the consultations implicate the agency's deliberative process privilege."  *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 323 (D.D.C. 2016).

concurring).   Those instructions are particularly appropriate when this Court is considering whether to grant injunctive or equitable relief, as here.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Due Process Clause attaches to U.S. persons and to aliens who have "entered the territory of the United States and established substantial connections with this country."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001).  Solely for the purposes of this opposition, Defendants assume, arguendo, that Plaintiffs satisfy these requirements.  *See* Pls.' Mem. at 34-35.  The next inquiry "is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *RidderCorp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  If plaintiffs have been deprived of a protected interest, the Court must determine "whether the procedures used by the Government in effecting the deprivation 'comport with due process.'"  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59).

Plaintiffs, however, have failed to show that they have been deprived of a protected liberty or property interest sufficient to entitle them to the extraordinary remedy of preliminary relief.  In determining whether an interest protectable under the Due Process Clause attaches at all, it is important to consider the different interests articulated by the different types of plaintiffs (Luokung itself versus the individual plaintiffs) and those implicated by different trigger dates (the May 8, 2021 effective date of the prohibition on U.S. persons engaging in transactions in certain publicly-traded Luokung securities, and the March 9, 2022 deadline for U.S. persons to divest any Luokung securities they had previously purchased).   Plaintiffs claim the following property or liberty interests in their brief.  *See* Pls.' Mem. at 36-38.

23

|  | May 8, 2021 Trigger Date | March 9, 2022 Trigger Date |
|---|---|---|
| Luokung | • Deprived of right to offer securities to U.S. persons and/or form future contracts with U.S. persons.<br>• Damage to international reputation and business.<br>• Subjected to severe stigma. | • Deprived of its existing contractual relationships with U.S. shareholders and financial institutions. |
| Individual Plaintiffs | • Prohibited from receiving Luokung stock and stock options. | • Deadline for divestment of existing holdings of Luokung securities. |

The initial set of purported protectable interests involve restrictions that are implicated as of May 8, 2021.

***First***, Plaintiff Luokung claims a liberty interest to "form[] future contractual relations." Pls.' Mem. at 36-37.   (Because E.O. 13959 only prohibits U.S. persons from engaging in "transactions in publicly[-]traded securities, or any securities that are derivatives of, or are designed to provide investment exposure to such securities," E.O. 13959 § 1(a)(i), rather than prohibiting contracts generally with U.S. persons, the reference to "future contracts" appears to simply be a reference to transacting publicly-traded securities with U.S. persons.)   As an initial matter, Luokung glosses over the fact that the designation of it as a CCMC does not have a tangible direct effect on the company; rather, the E.O.'s restrictions that come into play as a result of the designation applies to U.S. persons who transact in Luokung's publicly traded securities, not the company itself.   "The simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally" may resolve this case.   Indeed, "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of government action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 788-89 (1980) (holding

that the residents of a nursing home that was decertified by the government lack a due process interest permitting those residents to sue the government directly).[14]

Even, however, assuming that Luokung surmounts this obstacle, it cannot establish a protectable liberty interest.  Plaintiff Luokung points to no case establishing it has a constitutionally protected liberty interest in having U.S. persons transact in its publicly-traded securities.  To the extent Plaintiff Luokung claims a liberty interest, its argument appears to sound in the right to operate its chosen business as it sees fit, *i.e.*, to transact securities with whomever it wants.  This argument is best understood as a claim that Luokung's "right to . . . follow a chosen profession free from unreasonable interference," which "comes within the 'liberty . . . concept of the Fifth Amendment," is being hindered. *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)); *see also Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (acknowledging a "constitutionally protected right to follow a chosen trade or profession.").  The D.C. Circuit has distinguished between two types of stigma or reputation-based injuries that can give rise to a liberty interest protectable under the Due Process Clause.  Along with a showing that "the government has harmed their reputation," the plaintiff must also show "that the resulting stigma 'altered their status in a tangible way.'"

---

[14] In *O'Bannon*, the Court reserved the question of whether "if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing." *O'Bannon*, 447 U.S. at 780-90 n.22.  That question need not be resolved here, as the *O'Bannon* court "also observed that parties suffering an indirect adverse effect of government action 'clearly have no constitutional right to participate in the enforcement proceedings' when the directly regulated party had a 'strong financial incentive to contest [the government's] enforcement decision." *Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1041 (D.C. Cir. 1998) (quoting *O'Bannon*, 447 U.S. at 789-90 n.22).  Here, the individual plaintiffs—for whom the E.O. does directly affect—have such an interest, which they are pursing in this very lawsuit.

*Trifax*, 314 F.3d at 644 (quoting *Orange v. Dist. of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (brackets omitted).

> Broadly speaking, we have recognized two theories pursuant to which an individual who alleges 'government interference with his future employment prospects may demonstrate the tangible change in status required to prove constitutional injury.' *First*, 'if [the government's] action formally or automatically excludes [the plaintiff] from work on some category of future [government] contracts or from other government employment opportunities, that action . . . implicates a liberty interest. *Second*, if the government's action 'precludes [the plaintiff]—whether formally or informally—from such a broad range of opportunities that it interferes with [his] constitutionally protected right to follow a chosen trade or profession,' the action implicates a liberty interest.

*Crooks v. Mabus*, 845 F.3d 412, 421 (D.C. Cir. 2016) (quoting *Taylor v. Resolution Trust Co.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995) (quoting *Kartseva*, 37 F.3d at 1528). Here, Luokung does not allege automatic exclusion from government contracts or employment opportunities, nor, for that matter, does it identify any comparable direct restrictions. Accordingly, the second reputation-based injury theory applies, and Luokung must show that it has been precluded from such a broad range of opportunities that its right to follow its chosen trade or profession has been precluded, a showing it cannot make.

This is a demanding standard. In order to establish such a violation, plaintiffs must show that "the government has seriously affected, if not destroyed, their ability to obtain employment or contracts in their field." *Trifax Corp.*, 314 F.3d at 644 (quoting *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)) (alterations omitted); *see also Jackson v. Heh*, 215 F.3d 1326 (Table), *6 (6th Cir. 2000) ("Indeed, it is only where the defendant's actions effectively precludes the plaintiff from practicing his trade with *all* employers or customers that the plaintiff's liberty interest in pursuing his occupation is infringed.") (emphasis added) (collecting cases); *Capogrosso v. Gelbstein*, 18-cv-2710 (MKB)(LB), 2019 WL 6406444, at *11 (E.D.N.Y. Jan. 30, 2019) ("It is well settled that one must have no ability to practice one's profession at all in order to state a claim

for deprivation of a liberty interest.") (quoting *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999).

Plaintiff Luokung never claims such total preclusion.  Nor can it.  The challenged listing does not restrict Plaintiff Luokung's ability to sell its products in the United States or to U.S. persons.  Given that Plaintiffs themselves characterize Luokung as an advertising and mapping company, it cannot be reasonably said that this listing destroys its ability to pursue that field.  Even if Plaintiff Luokung could claim a narrower liberty interest in not being precluded from the sale of securities, it would again fail to show a total preclusion.  Plaintiff Luokung remains free to issue publicly-traded securities on the open market, which may be purchased by all but U.S. persons.  While there is, to be sure, a limitation on *who* may purchase such securities, the company's ability to transact in such publicly-traded securities has certainly not been "destroyed."[15]  *See, e.g.*, *Capogrosso*, 2019 WL 60644 at *11 (lawyer barred from representing clients before particular administrative tribunal does not have a liberty interest)

Accordingly, Plaintiff Luokung has not established that it has a constitutionally secured liberty interest in transacting publicly-traded securities with U.S. persons after March 15.

***Second***, with respect to the May 8 deadline, the individual plaintiffs claim that they will be prohibited from receiving stock and stock options as a part of Luokung's incentive plan after that date.  *See* Compl. ¶ 12; Pls.' Mem. at 37-38.  But these plaintiffs have not shown that they have a property right in the *future* receipt of securities.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral

---

[15] Luokung also posits that it will endure "severe stigma and damage to its reputation and business[.]"  *See* Pls.' Mem. at 36.  Reputational injury is evaluated under the "stigma-plus" or "reputation plus" requirement, which similarly requires the plaintiff to show that the government "has seriously affected, if not destroyed, their ability to obtain employment or contracts in their field."  *Trifax*, 314 F.3d at 644.  Again, Luokung cannot meet this standard.

expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  At best, these plaintiffs have a "unilateral expectation" that they will be able to receive such publicly-traded securities, but not a specific property right guaranteeing that they can do so.[16]  As a result, this provision of E.O. 13959 does not implicate their constitutionally protected property interests.

**Third**, Luokung claims that it will be deprived of its "existing contractual relationships with U.S. persons holding Luokung shares" once those entities and individuals are required to divest their publicly-traded securities as of March 8, 2022.  *See* Pls.' Mem. at 37.  But these relationships involve *publicly-traded securities*, where any contractual rights would be between Luokung and whomever the holder of that security happened to be.  Luokung does not advance an argument that it has a liberty interest in choosing the identity of the holder of a publicly-traded security, and it certainly cites no case law establishing such an interest.  Indeed, this would be an anomalous result: would, for example, Amazon have a due process right to notice and an opportunity to be heard if a Bankruptcy Court ordered a debtor to sell its security in order to pay a creditor?  Almost certainly not—and yet that, in effect, is the result that Luokung would require in this case.  As such, Luokung can claim no due process interests that will be implicated as of March 8, 2022, and thus was entitled to no process.

---

[16] Plaintiffs Bai and Li state that they are beneficiaries of Luokung's employee incentive plan, "which regularly awards, among other things, stock options, stock appreciation ("SARs") restricted stock, restricted stock units and unrestricted stock" and that as of May 8, 2021,  they "will no longer be able to purchase or vest Luokung securities[.]"  Pls. Mem. at 42.  These plaintiffs, however, do not establish facts showing that they have a property *entitlement* to such stock options in a way that creates a constitutionally protected property right in future options.

***Finally***, the individual plaintiffs claim that they have property interests that will be implicated when they are required to sell their publicly-traded securities by March 8, 2022.[17]   Pls.' Mem. at 37-38.   Defendants acknowledge that these plaintiffs have such property interests. However, because such interests will not be implicated until 2022, there is no immediate injury that would justify a preliminary injunction.   *See, e.g.*, *Verma v. U.S. Citizenship & Immigration Serv..*, No. 20-cv-3419 (RDM), 2020 WL 7495286, at * 11 (D.D.C. Dec. 18, 2020) ("[T]he certain and *immediate* harm that a movant alleges must also be truly irreparable in the sense that it is beyond remediation.") (citing *Elec. Priv. Info. Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (internal quotation marks omitted and emphasis added).   The purpose of a temporary restraining order is to maintain the status quo pending a decision on the merits and Plaintiffs have failed to show that this APA matter could not be decided well before January 2022, or even that the issues in question could not be remanded to the agency well before that date.   And even if this Court disagrees, Defendants respectfully submit that any preliminary injunction should be limited solely to current holders of Luokung securities, and solely to the obligation to divest by January 14.   *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief may "be

---

[17] Plaintiffs also argue that the term "affiliated with" in Section 1237 is unconstitutionally vague and therefore violates the Due Process Clause of the Fifth Amendment.   *See* Pls.' Mem. at 29-31.   For the reasons discussed herein, Plaintiffs have not demonstrated that they have cognizable liberty or property interests that would afford them constitutional protections.   In any event, the term "affiliated with" in Section 1237 "is sufficiently clear to 'give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"   *United States v. Class*, 930 F.3d 460, 469 (D.C. Cir. 2019) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).   Indeed, the term's ordinary meaning encompasses associations "on the basis of a common purpose or of shared characteristics."   *See* OED, affiliated (adj.), *available at* https://www.oed.com/view/   Entry/3404?rskey=CNrhfW& result=2&isAdvanced=false#eid; *see also* Merriam-Webster, affiliated (adj.) ("closely associated with another typically in a dependent or subordinate position"), *available at* https://www.merriam-webster.com/dictionary/affiliated#learn-more.

no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case).

### III.    Plaintiffs Have Not Established Certain, Imminent Irreparable Harm Justifying a Preliminary Injunction

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  The harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted).

Plaintiffs have the burden to put forth sufficient evidence to satisfy this high standard.  "The movant cannot simply make 'broad conclusory statements' about the existence of harm.  Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm . . . .' "  *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).

Many of the purported harms Plaintiff Luokung identifies constitute nothing more than theoretical outcomes, not certain and great injury.  For example, Plaintiffs allege that Luokung has seen "eroded market confidence" and will face further business ramifications absent a preliminary injunction.  *See* Pls.' Mem. at 42.  Yet Plaintiffs base this claim on the representation that Luokung "has seen *indications that some* of its other business partners will sever their relationships with Luokung as well."  *Id.* at 43 (emphasis added).  "Indications" of potential business issues with regard to "some" of Luokung's partners do not rise to the level of irreparable harm that would necessitate immediate relief.  *See Mead Johnson Pharm. Grp. v. Bowen*, 655 F. Supp.53,  53-56 (D.D.C. 1986) (rejecting as "pure speculation" a pharmaceutical company's claim in support of its

preliminary injunction motion that it would suffer loss of sales if a competing generic drug were approved and marketed), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988). Plaintiffs also claim that Plaintiff Li "will ultimately be compelled to leave the company should the CCMC Prohibitions go into effect, because he would no longer be able to receive his anticipated compensation in the form of equity." Pls.' Mem. at 43. The possibility of Plaintiff Li departing Luokung hardly constitutes certain, irreparable harm, especially given that his decision to change occupations would be his own professional decision, not an irreparable harm to the company. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur."). Similarly, Plaintiffs hypothesize that Luokung will face difficulty recruiting professional talent with the requisite technological skillset. *See* Pls.' Mem. at 42. This speculative assertion fails to establish how a preliminary injunction—as opposed to a decision on the merits—will improve the hiring of personnel. *Id.* Instead, Plaintiffs note that "several potential recruits for senior technical positions have expressed reluctance to join the company because of the U.S. government's actions." *Id.* But reluctance to accept a job cannot be viewed as irreparable injury to a company's ability to recruit professionals such that the Court must issue a preliminary injunction. Regardless, Plaintiffs acknowledge that Luokung is an expanding commercial technology company, and they do not explain, nor can they, how the alleged loss of "several potential recruits" justifies a preliminary injunction.

Plaintiff Luokung's claim of irreparable harm has another fundamental flaw. *See* Pls.' Mem. at 13-19, 42-44. Plaintiff Luokung alleges that it will endure economic harm, variously described as a loss of access to U.S. capital, harm to its relationship with U.S. financial institutions, reduction in its share price, damage to its reputation and market credibility, and difficulty recruiting and maintaining talent. *Id.* But "economic loss does not, in and of itself, constitute

irreparable harm."[18]  *Wis. Gas Co.*, 758 F.2d at 674.  "The universe of harms that meet this litmus

test is narrow indeed."  *Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*, 140 F. Supp. 3d 47, 53

(D.D.C. 2015).  "[E]ven where the United States is the defendant, 'a plaintiff must establish that

the economic harm is so severe as to cause extreme hardship to the business.'"  *Cal. Ass'n of Priv.

Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) (quoting *Coal. for

Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008));

*see also Xiaomi Corp.*, 2021 WL 950144, at *10 (recognizing that the economic harm must be

"significant").

Regardless of whether the economic harm must be significant or severe, Plaintiff Luokung

has not put forth sufficient evidence to demonstrate that it satisfies this elevated standard.  *Cal.

Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171; *Xiaomi Corp.*, 2021 WL 950144, at

*10.  Indeed, the representations made by Plaintiff Luokung in the Amended Complaint and in the

opening brief attest that: (1) Luokung has, to date, raised $190 million, Am. Compl. ¶ 23;

(2) Luokung is in the process of acquiring eMapgo Technologies (Beijing) Co., Ltd., *id.* at ¶ 24;

and (3) eMapgo, soon to be a subsidiary of Luokung, provides map services for 32 domestic and

foreign car manufacturers, including General Motors, involving more than 140 models of cars.

---

[18] In passing, the individual plaintiffs allege that they will "lose the opportunity to benefit
from future appreciation of their shares" and that these alleged injuries constitute irreparable harm
"particularly where damages cannot be recovered due to sovereign immunity[.]"  Pls.' Mem. at
45.  Courts in this district have rejected this premise, noting that "not only is such a rule not the
law of this Circuit, but it would also effectively eliminate the irreparable harm requirement."  *Air
Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C.
2012); *see also Figg Bridge Eng'rs, Inc. v. Fed. Highway Admin.*, No. 20-cv-2188 (CKK), 2020
WL 4784722, at *8 (D.D.C. Aug. 17, 2020) (same).  Rather, regardless of sovereign immunity,
Plaintiffs must establish "certain, great and actual" losses.  *See Nat'l Mining Ass'n v. Jackson*, 768
F. Supp. 2d 34, 52-53 (D.D.C. 2011); *see also Air Transport Ass'n*, 840 F. Supp. 2d at 336 (stating,
in a challenge against an entity where sovereign immunity barred damages, that "[e]conomic harm
may constitute irreparable injury, however, when 'the loss threatens the very existence of the
movant's business.'") (quoting *Wis. Gas*, 758 F.2d at 674).

Pls.' Mem. at 5.  Thus, Luokung appears to be an expanding commercial technology company with sufficient assets, not one suffering from extreme hardship that would warrant a preliminary injunction while the company pursues this lawsuit.

The circumstances in the instant case can be readily distinguished from the "enormity" of financial losses that the Court found warranted a preliminary injunction in *Xiaomi Corp.  See* 2021 WL 950144, at *10.  In that case, the Court noted that Xiaomi's stock price had dropped by 9.5% since its identification as a CCMC, which resulted in "an enormous loss of approximately $10 billion in market capitalization." *Id.* at *11.  The Court also cited the fact that at least three major financial institutions—Morgan Stanley, JP Morgan Chase, and Goldman Sachs—intended to sever their financial relationships with Xiaomi. *Id.*  Further, the Court observed that Xiaomi had already started to see an "exodus of lucrative contracts" that contributed, "in the aggregate," to the conclusion that the plaintiff has suffered a "substantial economic impact" warranting preliminary relief. *Id.*  In contrast, Luokung has not established that it has endured anything close to the enormous financial hit suffered by Xiaomi.  In fact, Luokung fails to identify any specific monetary figure or economic guidepost to substantiate its allegations of significant financial harm. *Compare Xiaomi Corp.*, 2021 WL 950144, at *10 (noting that the plaintiff's stock price has dropped by 9.5% resulting in the loss of approximately $10 billion), *with* Pls.' Mem. at 42-43 ("The CCMC Designation and the CCMC Prohibitions have also eroded market confidence in Luokung's ability to operate.").  To be sure, Luokung asserts that it will face economic repercussions from its identification as a CCMC. *See, e.g.*, Pls.' Mem. at 43-44 (alleging that Nasdaq will de-list Luokung on the effective date of the economic sanctions).  But while generally similar to the adversities established by Xiaomi, Luokung's speculative and unspecific concerns of economic

harm do not rise to the enormous, particular financial loss that warranted preliminary relief in the earlier case.

The irreparable harm arguments presented by the individual plaintiffs similarly fail. Plaintiff Li and Plaintiff Bai note that they will be forced to sell their ordinary shares of Luokung stock. *See* Compl. ¶¶ 11-12; Pls.' Mem. at 44-45. While they have accurately described their future obligations, the individual plaintiffs have not explained why they will suffer irreparable harm without a preliminary injunction *now* in light of the fact that they do not need to divest the stock until January 2022. *See* E.O. 13974, § 1; *see also Wis. Gas. Co.*, 758 F.2d at 674 ("[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.") (citation, quotation marks, and brackets omitted, emphasis in original). Likewise, the individual plaintiffs have not demonstrated why they will suffer irreparable harm when they can simply sell their Luokung stock and reinvest the proceeds in other publicly-traded securities or investment opportunities. *See Verma*, 2020 WL 7495286, at *11 (explaining that the alleged harm must be "truly irreparable in the sense that it is beyond remediation"). And, indeed, to the extent there is a violation, the individual plaintiffs have not established that Defendants could not cure any due process or APA errors, either voluntarily or on remand after a final judgment, before the January 2022 deadline, thus obviating the need for immediate relief.[19]

---

[19] Plaintiffs also allege that the purported denial of their constitutional rights constitutes ipso facto irreparable harm. *See* Pls.' Mem. at 38-39. For the reasons discussed above, Plaintiffs have not demonstrated a Fifth Amendment violation. *See supra*.

## IV.    The Balance of the Equities and Public Interest Strongly Favor the Government.

The public interest and balance of the equities "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  Neither the public interest nor the balance of equities favors Plaintiffs' request for preliminary relief.

The balance of the equities weighs strongly against the issuance of a preliminary injunction.  The Executive relies on a series of tools to effectuate the national security and foreign policy of the United States.  An important tool at its disposal is the declaration of a national emergency pursuant to IEEPA, as authorized by Congress, and the initiation of economic sanctions.  *See, e.g.*, *Holy Land Found.*, 219 F. Supp. 2d at 84 ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").  Here, for example, both Congress and the President have acknowledged the threat posed by companies linked to the military of the PRC.  *See* FY99 NDAA § 1237; FY21 NDAA § 1260H; E.O. 13959.  Indeed, the President explained that the PRC "is increasingly exploiting United States capital to resource and to enable the development and modernization of its military, intelligence, and other security apparatuses, which continues to allow the PRC to directly threaten the United States homeland and United States forces overseas[.]"  *Id.* On the other side of the scale, Plaintiffs ask the Court to take the extreme measure of issuing a temporary restraining order for the sole purpose of allegedly preventing incremental economic loss to an expanding commercial technology company or to minimize potential loss to that company's U.S. investors.  Pls.' Mem. at 41-42.  The equities favor the security and prosperity of the United States over the wealth of one particular corporation and its investors.[20]

---

[20] In *Xiaomi Corp.*, the Court was "somewhat skeptical" that the identification of Xiaomi as a CCMC implicated "weighty national security interests" given that past administrations did not employ Section 1237.  Defendants respectfully disagree with the Court's observation.  As

Further, the public has an interest in a robust, comprehensive, and varied approach to national security and foreign policy, including, when appropriate, the application of economic sanctions.  By invoking IEEPA and declaring a national emergency, the Executive determined that Plaintiff Luokung poses a national security threat to the United States and its citizens.  *See* E.O. 13959.  Plaintiffs would be hard-pressed to argue that the public interest lies with the financial prosperity of an expanding technology corporation or of certain investors, rather than the security of the country's citizenry.  *See Winter*, 555 U.S. at 24 (acknowledging the deference owed the Executive in the context of a preliminary injunction when the decision involves important national security considerations).

The case does not present the same public interest considerations that gave the Court pause in *Xiaomi Corp.*, 2021 WL 950144, at \*12.  In that case, the Court concluded that the limited factual predicate for identifying Xiaomi as a CCMC undermined the Government's contention that it was in the public's interest to deny the plaintiff's request for preliminary relief.  *Id.* (describing the Government's basis as "two generally innocuous facts").  But here, DoD identified a combination of factors contributing to the Government's decision to identify Luokung.  *See supra*; *see also* DoD Mem., at 1-2.  First, Luokung has partnered with a Chinese State-Owned Enterprise to, among other things, provide cooperation on digital city construction and smart city data

---

previously noted, the Government has various tools at its disposal to conduct foreign policy and protect the United States against its foreign enemies.  One such tool is the imposition of economic sanctions.  But even with regard to sanctions, the Executive may choose to utilize one authority over another weighing a myriad of factors.  *See Holder v. Humanitarian Law* Project, 561 U.S. 1, 33-34 (2010) (noting that "neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people").  Respectfully, the decision of the prior administration to utilize Section 1237 when others have not chosen to do so should have no bearing on the Court's decision about whether to grant or deny preliminary relief.  *Cf. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential.").

operations.   DoD Mem., at 2.  Second, Luokung has entered a strategic cooperation agreement with the China National Geospatial Information Center, an institution under a PRC government agency, the National Development and Reform Commission.  *Id.* at 1.  Third, a wholly owned subsidiary of Luokung has established comprehensive cooperation with Huawei Investment & Holding Co., Ltd., another CCMC.  *Id.* at 2.  And fourth, Luokung has invested in technologies core to the PRC's Military-Civil Fusion strategy, such as "measurement and control systems for rockets, satellites and earth stations," and in Artificial Intelligence (AI) and Autonomous Systems. *Id.* at 1.  Accordingly, this case is distinguishable from *Xiaomi Corp.*

In sum, even if Plaintiffs established some amount of economic harm, the "weighty interests of national security and foreign affairs" squarely tip the balance of equities and public interest in favor of the Government.  *Humanitarian Law Project*, 561 U.S. at 33-34; *see also Def. Distributed v. Dep't of State*, 838 F.3d 451, 458-60 (5th Cir. 2016) (Government's interests in national defense and national security outweighed potential temporary infringement of plaintiffs' constitutional rights).

## CONCLUSION

For the aforementioned reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

Dated April 16, 2021                         Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Acting Assistant Attorney General

                                             ALEXANDER K. HAAS
                                             Branch Director

                                             ANTHONY J. COPPOLINO
                                             Deputy Branch Director

                                             BRIGHAM BOWEN

Assistant Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
STEPHEN M. ELLIOTT
JAMES R. POWERS
Trial Attorneys
U. S. Dept. of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20005
Tel.      (202) 514-1944
Email:  joseph.borson@usdoj.gov

*Counsel for Defendants*