**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LUOKUNG TECHNOLOGY CORP., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 21-583 (RC) |
| | : | | |
| v. | : | Re Document No.: | 26 |
| | : | | |
| DEPARTMENT OF DEFENSE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.  INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction.

Plaintiffs, Luokung Technology Corp. ("Luokung") and individual Luokung shareholders

Baomin Li and Raymond Weiman Bai (collectively, "Plaintiffs") seek an order enjoining the

Department of Defense from enforcing its designation of Luokung as a Communist Chinese

military company ("CCMC") pursuant to Section 1237 of the National Defense Authorization

Act for Fiscal Year 1999 ("NDAA FY99"), Pub. L. 105-261, 112 Stat. 2160 (Oct. 17, 1998) (as

amended) ("Section 1237").  Such designation forbids all U.S. persons from purchasing or

otherwise possessing Luokung's publicly traded securities or any derivatives of said securities.

Without preliminary injunctive relief, these restrictions will begin to go into effect on May 8,

2021.  The Court will issue the requested preliminary injunction, because Plaintiffs have shown

both a high likelihood of success on the merits on their Administrative Procedure Act ("APA")

claims and that, absent relief, they will suffer irreparable harm in the form of serious reputational

and unrecoverable economic injuries.  Accordingly, for the reasons detailed below, Plaintiffs'

motion for preliminary injunction is granted.

## II.  BACKGROUND

### A.  Statutory Background: Section 1237

This suit concerns Luokung's designation as a CCMC under Section 1237 of the NDAA

FY99, as amended.  Pursuant to this provision, the President is authorized to exercise

International Emergency Economic Powers Authority ("IEEPA") against CCMCs.[1]  *See* NDAA

FY99, § 1237(a)(b).  Section 1237, in turn, defines a CCMC as any person who "is owned or

controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of

the People's Republic of China or that is owned or controlled by an entity affiliated with the

defense industrial base of the People's Republic of China."  NDAA FY99 § 1237(b)(4)(B)(i).

The statute further defines the People's Liberation Army ("PLA") as "the land, naval, and air

military services, the police, and the intelligence services of the Communist Government of the

People's Republic of China, and any member of any such service or of such police."  *Id.* §

1237(c).

Section 1237 directs the Secretary of Defense, with the input of the Attorney General, the

Director of the Federal Bureau of Investigation, and the Director of Central Intelligence, to

identify "[CCMCs] that operate directly or indirectly in the United States or any of its territories

or possessions."  *Id.* §1237(b).  This list is to be published in the Federal Register, and also

provided to the Committee on Armed Services of the U.S. House of Representatives, the

---

[1] Pursuant to IEEPA, in cases of national emergency, the President is authorized to, *inter alia*, "direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . ."  50 U.S.C. § 1702(a)(1)(B).

Committee on Armed Services of the U.S. Senate, the Secretary of State, the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Secretary of Energy, and the Director of the Central Intelligence Agency. *Id.*

While originally enacted with the directive to update the list of CCMCs annually, the Department of Defense published its first list of designated CCMCs on June 24, 2020, designating twenty companies as falling within this category. Fifteen additional companies would receive this designation by the end of the 2020 year. On January 14, 2021, the Department of Defense made its most recent listing of designated CCMC companies, a list which included a misspelled version of Luokung. *See* Jan. 14, 2021, Press Release at 3, ECF No. 22-1. This brought the total number of CCMC-designated companies to 44 total. However, to date, only two companies have challenged the designation. Last month, this Court issued a preliminary injunction halting Xiaomi Corporation's ("Xiaomi") designation as a CCMC, after it found the company to have a high likelihood of success on the merits of their APA claims, and that without injunctive relief, the company would suffer irreparable harm due to serious reputational and unrecoverable economic injuries. *See Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *1 (D.D.C. Mar. 12, 2021). Luokung now seeks the same relief, on largely similar grounds.

### B. Factual and Procedural Background

#### 1. Luokung

Luokung is a publicly traded commercial technology company that is headquartered in China and incorporated in the British Virgin Islands. Am. Compl. ¶ 11, ECF No. 22. The corporation "offers a broad range of products and location-based services for civilian and commercial use, including map software and services and cloud platform software." *Id.* ¶ 19. The company has two principal lines of business. Decl. of Baomin Li ("Li Decl.") ¶¶ 8–9, ECF

No. 26-8.  The first business line is advertising revenue that is derived from Luokung's mobile application which provides localized content for travelers in China, such as nearby amenities and posts from other nearby app users.  *Id.*  The second line of business is navigation and mapping technology, such as the mapping functionalities used in autonomous automobiles.  *Id.* ¶¶ 8, 12. Luokung is one of the four largest suppliers of in-dash car navigation systems in China.  *Id*. ¶ 12.

Luokung is publicly traded exclusively on the Nasdaq, and has thousands of U.S. shareholders, several of which account for some of the company's "top-10 current largest shareholders."  Am. Compl. ¶¶ 19, 21–22.  While Luokung's eleven largest investors own approximately 60% of its ordinary shares, Li Decl. ¶ 24, the company is effectively controlled by Luokung's Chief Executive Officer Xuesong Song, who owns the largest percentage of Luokung's ordinary shares and holds approximately 61.7% of the company's voting rights, Decl. of Xuesong Song ("Xuesong Decl.") ¶ 7, ECF No. 26-9.  Luokung is also overseen by a board of five directors, on which Mr. Song also serves as Chairman.  *Id.* ¶¶ 1, 6.  The company asserts that none of these shareholders nor Mr. Song are in any way affiliated with the Chinese government, military, or defense industrial base.  *Id*. ¶¶ 2–3, 6.

### 2.  Luokung's Designation as a CCMC

On November 12, 2020, then-President Trump issued Executive Order No. 13959, *Addressing the Threat from Securities Investments that Finance Communist Chinese Military Companies*, (Nov. 12, 2020) ("E.O. 13959"), ECF No. 22-2.  The President declared a national emergency under IEEPA due to the security threat posed by CCMCs that support the People's Republic of China's ("PRC") military and intelligence activities.  *Id*.  The order described that through a "national strategy of Military-Civil Fusion," the PRC compels civilian Chinese companies to support its military and intelligence activities, and these companies in turn "raise

capital by selling securities to United States investors . . . exploit[ing] United States investors to finance the development and modernization of [the PRC's] military." *Id.* The President concluded that these actions "allow the PRC to directly threaten the United States homeland and United States forces overseas, including by developing and deploying weapons of mass destruction, advanced conventional weapons, and malicious cyber-enabled actions against the United States and its people." *Id.*

As a result, E.O. 13959 prohibited all United States persons from engaging in select investment activities with any CCMC, including a blanket prohibition on any "transaction in publicly traded securities, or any securities that are derivative of, or are designed to provide investment exposure to such securities of any [CCMC]." *Id.* § 1(a)(i). The executive order was later updated to expressly require all United States persons to fully divest of any CCMC securities within 365 days of a company's designation. Exec. Order No. 13974, *Amending Executive Order 13959—Addressing the Threat from Securities Investments that Finance Communist Chinese Military Companies* (Jan. 13, 2021), ECF No. 22-3. For the purposes of the order and resulting restrictions, a CCMC was defined as "any person that the Secretary of Defense, in consultation with the Secretary of the Treasury, publicly lists as a Communist Chinese military company meeting the criteria in section 1237(b)(4)(B) . . . and that operates directly or indirectly in the United States or any of its possessions." *Id.* § 2.

On January 14, 2021, the Department of Defense submitted to Congress, pursuant to Section 1237, a list of designated CCMC companies that included "Luokong Technology Corporation (LKCO)", a misspelled version of Luokung. *See* Jan. 14, 2021 Press Release at 3.

At the time, no explanation for the designation was provided.[2]  On March 9, 2021, the Secretary of Defense informed Congress that it had in fact intended to designate Luokung (not "Luokong Technology Corporation") as a CCMC and the incorrect listing was due to a "mistransliteration." Letter from Kathleen Hicks, Dep't of Defense, to Sen. Jack Reed (Mar. 9, 2021), ECF No. 22-4. The next day, Plaintiffs were notified that the CCMC prohibitions would go into effect on May 8, 2021, with full divestment required by March 9, 2022.  *See* Letter from Bradley T. Smith, Office of Foreign Assets Control ("OFAC"), to Luokung (Mar. 10, 2021), ECF No. 15-2.

In the course of this litigation, Defendants disclosed the decision document setting forth the purported factual bases for the Department of Defense's decision to designate Luokung as a CCMC.  *See* Am. Compl. Ex. G ("Decision Memo"), ECF No. 22-7.  The three-page document shows that the Department of Defense based its conclusion that Luokung is "owned, controlled, or affiliated with the PLA, PRC, or affiliated with the PRC defense industrial base" and thus can appropriately be designated as a CCMC, on five factual grounds.  *Id.* at 1.  First, the memorandum states that Luokung, along with its strategic partner LandSpace Technology Corporation Ltd., "work together on commercial space cooperation" including on "spatial-temporal big-data applications, aerospace applications systems, and measurement and control systems for rockets, satellites and earth stations."  *Id*.  The memorandum indicates that these products are considered a "[t]raditional [s]ector of the Defense Industrial Base and a "[c]ritical

---

[2] OFAC issued General License 1A effective January 27, 2021, which provided an extended period of time until May 27, 2021, for U.S. persons to trade securities or derivatives of entities that "closely match" (but are not the same as) those names listed as a CCMC on a Section 1237 list.  *See* Bradley T. Smith, OFAC Exec. Order 13959 General License No. 1A (Jan. 26, 2021),  ECF No. 9-7.  Given the discrepancy between the January 14, 2021 named entity, "Luokong Technology Corporation," and Luokung's legal name, "Luokung Technology Corp.," Luokung sought confirmation from OFAC that the General License 1A would apply. *See* Decl. of Lawrence Ward ¶ 5, ECF No. 9-6.  OFAC never responded to its inquiries.  *Id.*

[t]echnology for modern military operations," according to the 2019 DoD Industrial Capabilities Report. *Id.* Second, the memorandum indicates that Luokung designs and employs artificial intelligence and autonomous systems, two other "[c]ritical [t]echnologies used for modern military purposes" according to the same Department of Defense report. *Id.* Third, the document identifies that in July 2020, Luokung entered into a "strategic cooperation agreement" with the China National Geospatial Information Center, an organization of the PRC's National Development and Reform Commission, to "promote the wide application of geospatial information data and technical services in spatial planning, e-government, smart city, smart ecology, and smart agriculture." *Id.* at 1–2. The agreement was characterized as demonstrating a "close affiliation with the main body of PRC economic regulation and planning" as well as "potential affiliation with the surveillance capabilities of the PRC National Police." *Id.* at 2. Fourth, the Decision Memo details that in July 2020, Luokung entered into an "in-depth partnership" with the State-Owned Enterprise Yangtze River Yuntong Group Co., Ltd., in order "to provide cooperation on digital city construction, smart city data operation, transportation, and municipal administration multi-level cooperation in technologies, products, and markets in areas such as smart service solutions for public industries." *Id.* This partnership was also characterized as demonstrating a "close affiliation with the PRC and potential affiliation with the surveillance capabilities of the PRC National Police." *Id.* The fifth and final factor noted was that in 2019, Luokung's wholly owned subsidiary eMapgo Technologies (Beijing) Co., Ltd., established "comprehensive cooperation" with Huawei Investment & Holding Co., Ltd, another company that has been designated as a CCMC. *Id.* After stating these facts, the decision memorandum concluded by stating perfunctorily that "Luokung Technology Corp. meets the criteria" for CCMC classification. *Id.* at 3.

3.  Procedural History

Plaintiffs filed their complaint challenging Luokung's designation as a CCMC on March 4, 2021, *see* Compl., ECF No. 1, and went on to amend their complaint on March 23, 2021, *see* Am. Compl.  The Amended Complaint challenges the CCMC designation on six different grounds, asserting that the government's actions violate the APA (Count I–II), that the designation is *ultra vires* as it exceeds the relevant statutory authority granted under Section 1237 and Executive Order 13959, respectively (Count III–IV), and that the designation amounts to due process violations of the Fifth Amendment (Count V–VI).  *See generally* Am. Compl.

On April 2, 2021, Plaintiffs filed a motion for a preliminary injunction.  *See* Pls.' Mem. Supp. Mot. Prelim. Inj. ("Pls.' Mot."), ECF No. 26-1.  Defendants have opposed the motion, *see* Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 27, and Plaintiffs have filed a reply, *see* Reply Mem. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 28.  The Court heard oral argument on May 3, 2021 to consider the parties' positions.  Plaintiffs' motion is accordingly fully briefed and ripe for decision.

## III.  LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  When "the Government is the opposing party," the determination of the third and fourth factors regarding

"harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial, and a court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show <u>either</u> irreparable injury or a likelihood of success on the merits." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (emphasis in original). Even if the movant can make an independent showing of the first two factors, relief does not issue automatically. Rather, as the third and fourth factors suggest, a preliminary injunction is an equitable remedy committed to the court's "sound discretion." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## IV.  ANALYSIS

### A.  Likelihood of Success on the Merits

The Court begins with the "most important factor" in its preliminary injunction analysis, a consideration of whether Plaintiffs have demonstrated a "likelihood of success on the merits." *Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014). Plaintiffs have shown that Luokung's CCMC designation was likely made in violation of the APA in that it was arbitrary and capricious and made in excess of the authority granted under Section 1237, and accordingly the first preliminary injunction factor weighs in favor of relief.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). Courts are to afford heightened deference to an agency's determination when it concerns national security, as is the case here.

*See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) (noting that sanction determinations "are an important component of U.S. foreign policy, and . . . entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).  However, even in this context, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

Reasoned decision-making mandates that an agency "articulate a satisfactory explanation for its action" with a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  For "record-based factual conclusion[s]" this requires that an agency's final determination be "supported by substantial evidence."  *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999).  A lack of substantial evidence can be shown when an agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  In this situation a court must set the agency determination aside as arbitrary and capricious.  *Id.*

Additionally, the APA empowers a reviewing court to "set aside" an agency action that exceeds its statutory "authority" or "limitations." 5 U.S.C. § 706(2).

Plaintiffs argue that the decision to designate Luokung as a CCMC violates a number of APA requirements.  Pls.' Mot. at 21.  First, they contend that the Defendants' proffered explanation for the designation is "inadequate" due to a number of flaws in the Decision Memo—including that the document fails to explicitly recognize Section 1237 as the source of the government's authority, incorrectly quotes the statute at issue, and cites outdated and

incorrect company information—along with being altogether conclusory.  *Id.* at 21–23.  Second,

they assert that "Luokung does not meet the Section 1237 statutory criteria," meaning the CCMC

designation was made "in excess of the agency's authority."  *Id.* at 24–26.  Third, Plaintiffs claim

that Luokung's designation decision lacks the required "substantial evidence" necessary under

the APA for an agency to arrive at a factual conclusion.  *Id*. at 26–32.  Fourth, Plaintiffs assert

that the CCMC decision "was made without observance of procedure required by law," due to

the Department of Defense's failure to engage in the statutorily mandated consultation with the

Attorney General, the Director of Central Intelligence, and the Director of the Federal Bureau of

Investigation prior to any CCMC designation.  *Id.* at 32.  For the reasons discussed below, the

Court finds that Plaintiffs have met their burden of showing a likelihood of success on the merits

on the majority of their APA claims.

### 1.  Statutory Analysis of the Term "Affiliated With"

As Defendants' counsel conceded at oral argument, *see* Hr'g Tr. 21:3-5, this case rises

and falls on the definition the Court finds most appropriate to give to the term "affiliated with" as

used in Section 1237.[3]  Section 1237 defines a CCMC as any person who:

> is owned or controlled by, *or affiliated with*, the [PLA] or a ministry of the
> government of the [PRC] or that is owned or controlled by an entity affiliated
> with the defense industrial base of the [PRC].

NDAA FY99 § 1237(b)(4)(B)(i) (emphasis added).

The Court was presented this same issue in *Xiaomi*, where it found that "the

overwhelming weight of authority" supported finding that the "plain and common meaning of

---

[3] Defendants do not attempt to argue that Luokung is "owned or controlled" by any of the
proscribed Chinese entities delineated in Section 1237.  Instead, Defendants contend that
Luokung was designated as a CCMC because it is "affiliated with the [PLA], government
ministries of the [PRC], or . . . the PRC defense industrial base."  Defs.' Opp'n at 18 (alterations
in original) (citing Decision Memo at 1).

'affiliated with' is . . . 'a company effectively controlled by another or associated with others under common ownership or control.'"  2021 WL 950144, at *6 (citing *Mey v. DIRECTV, LLC*, 971 F.3d 284, 289 (4th Cir. 2020)); *see also id.* (noting that Congress had passed numerous statutes using this formulation of the phrase, and that this definition has been adopted across the federal courts as the "plain and ordinary meaning" of the term).  Defendants do not dispute that if this definition were to apply, Luokung plainly fails to meet the statutory definition for a CCMC.  *See* Hr'g Tr. 21:3-5 (noting that adoption of this definition would mean "the game is over for the government").  However, Defendants urge the Court to reconsider what they consider to be the "narrow[] constru[al]" of the phrase "affiliated with," Defs.' Opp'n at 18, bringing a number of new (and old) arguments to the Court's attention.  The Court evaluates each of these arguments in turn, but finds that even given this second bite at the apple, that Defendants' arguments are unconvincing.[4]

    While somewhat unclear, it appears that Defendants would have the Court return to the same two dictionary definitions it proffered the last go-around.  As such, Defendants contend that Luokung would be "affiliated with" one of the prohibited persons under Section 1237 if it is found to have  "a common purpose" or "shared characteristics," or is "closely associated with another typically in a dependent or subordinate position."  Defs.' Opp'n at 18 (citing definitions

---

[4] Plaintiffs argue that Defendants are collaterally barred from re-litigating the issue of the proper definition for "affiliated with" given this Court's determination in *Xiaomi*.  *See* Pls.' Reply at 7.  Given the emergency posture of the *Xiaomi* ruling, the Court finds that application of collateral estoppel in this circumstance would be inappropriate.  *See Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 208 (D.D.C. 2010) ("[i]ssues litigated in the context of a preliminary injunction traditionally would not form a basis for collateral estoppel.").

from Oxford English Dictionary and Merriam Webster).[5]  Defendants raise five arguments in

support of this definition.

First, Defendants argue that in drafting Section 1237, Congress used the adjectival phrase

"affiliated with" not the noun "affiliate," which they contend suggests a broader reading of the

term.  Defs.' Opp'n at 19.  As a result, Defendants would have the Court disregard any authority

(several of which the Court relied upon in *Xiaomi*) that defined "affiliate," not the full phrase

"affiliated with."  *Id.*  But Defendants cite no support for their assertion that a broader reading

due to the adjectival form is required.  Indeed,  another court that considered this very issue

concluded that "affiliate" and "affiliated with" are simply "different forms of the same word, and

the substantive meaning of the terms is the same."  *Mandel v. Associated Collection Serv. Inc.*,

No. 13-cv-02100, 2015 WL 1508842, at *4 (D. Ariz. Mar. 31, 2015) (rejecting argument that

"affiliated with" should encompass the broader definition of a "general 'business relationship'").

Furthermore, both the Treasury Department and the Department of Justice's Office of Legal

Counsel have employed a definition of "affiliated" that is substantially similar to Plaintiffs'

definition.  *See, e.g.*, 26 C.F.R. § 56.4911-7(a)(1) (treasury regulation instructing that "two

organizations are affiliated" if one organization is able to control the other); *Excl. Religiously Aff.*

---

[5] In *Xiaomi*, the Court noted that this "'closely associated'" affiliate definition was
explicitly rejected by the Eleventh Circuit as "'unpersuasive and contradicted by the weight of
the authorities,'" in favor of the definition Plaintiffs' argue is appropriate here.  2021 WL
950144, at *7 (citing *Emory v. Neurocare*, 985 F.3d 1337, 1345 (11th Cir. 2021)).  Additionally,
the "common purpose" or "shared characteristics" affiliate definition has not been adopted by
any federal courts.  This stands in stark contrast to the "effectively controlled by another or
associated with others under common ownership or control" definition adopted in *Xiaomi*, which
has been recognized as the plain meaning of this term in numerous federal court cases, as well as
in other statutes and agency regulations.  *See id.* at *6–7 (collecting cases, statutes, and
regulations).  It is, of course, "a 'fundamental canon of statutory construction' that words
generally should be 'interpreted as taking their ordinary, contemporary, common meaning.'"
*Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin v. United States,*
444 U.S. 37, 42 (1979)).

*Schs. Charter-Sch. Grant Prgm.,* 2020 WL 7319331, at *2 (O.L.C. Feb. 18, 2020) ("Generally speaking, one entity is 'affiliated' with another if the two have a close association, such as when they have formally distinct business operations *but are under common ownership or control*.") (emphasis added).  For these reasons, the Court finds this argument unpersuasive.

Second, Defendants posit that the Court's current "narrower construction" of the "affiliated with" phrase "would render 'affiliated' largely superfluous to the statute's separate criteria concerning ownership and control."  Defs.' Opp'n at 20.  This would of course violate the canon of statutory interpretation that "statutes should be read to avoid making any provision 'superfluous, void, or insignificant.'"  *Milner v. Dep't of the Navy*, 562 U.S. 562, 575 (2011) (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001).  But contrary to Defendants' representation, superfluity is simply not an issue here.  The definition advanced by Plaintiffs and used by this Court in *Xiaomi* defines "affiliated with" as when one entity is "*effectively* controlled by another or associated with others under common ownership or control."  *Xiaomi*, 2021 WL 950144, at *7 (emphasis added).  Both scenarios of "effective control" and "association under common ownership or control" are distinct from Section 1237's other prongs discussing ownership and direct control, *see* Section 1237 (defining a CCMC as a company "owned or controlled by, or affiliated with" various Chinese entities), and thus avoid rendering any part of the statutory language superfluous.  If anything, an inquiry into potential superfluidity shows that this is a weakness in Defendants' proffered definition.  For if "affiliated with" means a "common purpose," "shared characteristics," or "closely associated with another," any of these formulations would make the existing terms in Section 1237 (*i.e.*, "owned or controlled by") superfluous as they would necessarily fall within Defendants' expansive definition of "affiliated with."  For these reasons, the Court also declines to give this argument persuasive weight.

14

Third, Defendants reference a broader CCMC definition used in a Department of Defense regulation governing military acquisitions to argue that this Court should similarly broadly construe Section 1237's definition of a CCMC. Defs.' Opp'n at 19–20. The Court is skeptical that it should grant this much interpretative power to an entirely different CCMC definition as used in an entirely different context. Namely, the Department of Defense regulation in question was designed to protect and prohibit the introduction of Chinese malicious items into the military supply chain. *See* 48 C.F.R. § 225.770-2 ("Do not acquire items . . . through a contract or subcontract at any tier, from any Communist Chinese military company.").[6] A CCMC, for the purposes of this regulation, is defined to include "any entity, regardless of geographic location, that is—(1) A part of the commercial or defense industrial base of the People's Republic of China (including a subsidiary or affiliate of such entity)" 48 C.F.R. § 225.003. Given the entirely different context of supply chain security, it makes sense that a CCMC would have been intentionally defined more broadly for the purposes of this regulation compared to the economic sanctions policy at issue in Section 1237. It is hard to see, however, the import this has to the Court's statutory inquiry into the proper scope of "affiliated with" under Section 1237. At the heart of the matter, the CCMC definition as used in the Defense Department regulation is entirely unique and even somewhat contradictory to the plain language of Section 1237. To the extent that the government is asking this Court to give credence to this definition over that of the

---

[6] The regulation at issue was designed to implement Section 1211 of the FY 2006 NDAA, which states its main area of concern "is with the integrity of the [Department of Defense] supply chain and to prevent insertion of malicious items from China into U.S. Weapons platforms, information technology systems, and other areas, presenting a threat to [U.S.] warfighters and their ability to defend U.S. national security." Defense Federal Acquisition Regulation Supplement: Foreign Commercial Satellite Services and Certain Items on the Commerce Control List (DFARS Case 2018-D020), 83 Fed. Reg. 66,066, 66,071 (Dec. 21, 2018).

plain text of Section 1237, this is something the Court cannot do.  *See Pharm. Rsch. & Mfrs of Am. v. U. S. Dep't of Health & Hum. Servs.*, 138 F. Supp. 3d 31, 48 (D.D.C. 2015) ("[I]t is elementary that 'no deference is due to agency interpretations at odds with the plain language of the statute itself.'") (quoting *Smith v. City of Jackson*, 544 U.S. 228, 266 (2005)).  As a result, the Court finds that this regulation offers little in the way of persuasive support to convince the Court to adopt Defendants' preferred definition.

Fourth, Defendants argue that an examination of the relevant legislative history "supports the view that the current definition of CCMC is intended to use a relatively broad conception of 'affiliated with' that is not solely limited to corporate structure."  Defs.' Opp'n at 20.  Even setting aside the general principal that a court should always rely first on "ordinary meaning" and not allow legislative history to "'muddy' the meaning of 'clear statutory language,'" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019)(citation omitted), the legislative history Defendants highlight does not actually challenge the "affiliated with" definition advanced by Plaintiffs.  The legislative history in question consists of a House Report accompanying the fiscal year 2005 NDAA that states that this legislation was intended to "expand the definition of a 'Communist Chinese military company'" as defined in FY99 NDAA, "to include Chinese firms owned or operated by a ministry of the People's Republic of China or an entity affiliated with the defense industrial base of the People's Republic of China, such as the China State Shipbuilding Corporation or the China Overseas Shipping Corporation."  *See* H.R. Rep. No. 108-491,  at 366– 67 (2004).  The House Report went on to note that "[e]xisting law only applies the definition to entities owned or operated by the [PLA], thereby excluding a class of firms engaged in Chinese military modernization."  *Id.*  But contrary to Defendants' implication, the "affiliated with" definition used in *Xiaomi*—that it applies when one entity is "effectively controlled" by

another—fits within this framework and would encompass the quasi-independent firms that engage in Chinese military modernization.  The two examples provided in the House Report—the China State Shipbuilding Corporation and the China Overseas Shipping Corporation ("COSCO")—support this conclusion, as both entities are State-Owned Enterprises with extensive ties to China's defense technology industry, operating under the effective control of the Chinese state military apparatus.[7]  Consequently, the Court concludes that this legislative history corresponds with the "affiliated with" definition this Court has already endorsed.  As a result, this argument also fails to convince the Court that it should adopt Defendants' preferred definition.

Fifth and last, Defendants contend that following the definition relied upon in *Xiaomi* will result in negative policy consequences that contravene Section 1237's intended purpose.  They argue that such a definition would "fail to address the threat posed by Military-Civil Fusion that Congress was attempting to address" because "as long as a ministry of the PRC government did not directly assert financial ownership over a civil corporation, the corporation would be immune from sanction, regardless of its level of cooperation with the PRC military."  Defs.' Opp'n at 20. This is plainly incorrect.  The "affiliated with" definition advanced by the Plaintiffs and previously adopted by the Court would allow for a CCMC designation to be made when an entity is "effectively controlled" by the PRC government or other PLA entity.  This means direct financial ownership is not necessarily required, and this definition can still appropriately target the unique security threat posed by Chinese Civil-Military Fusion.

---

[7] *See* Jude Blanchette, Jonathan E. Hillman, Maesa McCalpin & Mingda Qiu, *Hidden Harbors: China's State-Backed Shipping Industry*, Ctr. For Strategic & In't Stud., (July 8, 2020), https://www.csis.org/analysis/hidden-harbors-chinas-state-backed-shipping-industry (noting that China State Shipbuilding Corporation, now merged into the China Shipbuilding Group, as well as COSCO are both "state-owned enterprises").

Indeed, the Court is far more persuaded by the countervailing policy argument raised by Plaintiffs, that if Defendants' preferred, extremely broad definition for "affiliated with" is adopted, that it would have almost no limiting principal.  *See Xiaomi*, 2021 WL 950144, at *7 (noting that the government's preferred "definition could imbue Section 1237's use of 'affiliate' with 'a meaning so broad that it is inconsistent with [the statute's] accompanying words, thus giving unintended breadth to the Acts of Congress.'") (quoting *Yates v. U.S.*, 574 U.S. 528, 543 (2015)).  To this point, at oral argument Defendants had no satisfactory response to the claim that their definition of "affiliated with" would potentially encompass all Chinese government contractors, even those that, as here, produce products with no direct military applications.  *See* Hr'g Tr. 25:20–23 (indicating, without further explanation, that not "every Chinese contractor" would "necessarily" fall within their definition).[8]  There is no indication that Congress intended to provide the Department of Defense with this sort of unfettered discretion.  Consequently, the pertinent policy implications also urge the continued use of the "affiliated with" definition adopted in *Xiaomi*.

Having considered each of Defendants' arguments in favor of adopting their broader statutory definition for the term "affiliated with" as used in Section 1237, the Court concludes that none are compelling.  As a result, the Court will continue to interpret the phrase as "a company effectively controlled by another or associated with others under common ownership or control."

---

[8] Further buttressing this point is evidence provided by Plaintiffs that the government considered and ultimately declined to designate the "largest and better-known Chinese technology companies involved in AI because of the economic harm it would cause."  Pls.' Mot at 28–29 (citing *Americans Won't Be Banned from Investing in Alibaba, Tencent and Baidu*, WSJ, (Jan. 13, 2021)).

2.  Luokung's CCMC Designation Likely Violated the APA

Given the Court's conclusion with regard to the statutory interpretation question, it should come as no surprise that it now finds that Luokung's CCMC designation violated the APA on a number of different grounds.  As Defendants' counsel admitted at oral argument, the Court's continued use of its prior definition of "affiliated with" would mean that "the game is over for the government."  Hr'g Tr. 21:5.  The Court will accordingly describe below the ways in which the designation was arbitrary and capricious and also exceeded the Department of Defense's grant of statutory authority under Section 1237.

a.  *Luokung's CCMC Designation was Arbitrary and Capricious*

The Court begins with an analysis of the ways in which Luokung's CCMC designation was not based on substantial evidence as required under the APA.  When an agency action is "bound up with a record-based factual conclusion" the reviewing court is tasked with determining if the agency's conclusion is supported by "substantial evidence."  *Dickinson*, 527 U.S. at 164.  In applying this standard, the reviewing court cannot "displace . . . [a] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  Instead, the court must ask, "whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion."  *Dickinson,* 527 U.S. at 164 (internal citations omitted).  Even under this deferential standard, the Court finds that a reasonable mind could not accept that the Decision Memo provides an adequate factual basis to conclude that Luokung was "affiliated with" the PRC or PRA.

The Department of Defense relied on five total pieces of evidence in its Decision Memo—all of which are public, non-classified data seemingly pulled from general news articles

or Luokung's own company website— to conclude that Luokung met Section 1237's statutory criteria and should be classified as a CCMC.  The five facts can be sorted into two general categories: (1) evidence of Luokung's involvement in technologies the Defense Department has classified as "essential to modern military operation," and (2) evidence of various types of partnerships between Luokung and organizations with ties to the PRC.  The Court addresses each type of evidence in turn. [9]

The Decision Memo describes how Luokung, alongside its strategic partner Land Space Technology Corporation Ltd ("Land Space"), is developing technology with commercial space applications.  Decision Memo at 1.  It also notes that Luokung is involved in the development of artificial intelligence and autonomous systems.  *Id.*  The document concludes that both of these types of technologies are "[c]ritical" and used for modern military purposes and operations according to the 2019 Department of Defense Industrial Capabilities Report.  *Id.*  But Luokung does not design or manufacture any military or defense products.  *See* Pls.' Mot. at 28 (citing Li Decl. ¶ 26).  And as this Court explained in *Xiaomi,* just because certain "technologies have military applications as well cannot be enough to support a conclusion that [a company] is a CCMC" as "such an outcome could result in a situation where any Chinese company involved in technology that has alternative military uses could be designated as a CCMC."  *Xiaomi*, 2021 WL 950144, at *8.  This is because involvement in these industries is not enough to show that Luokung is "effectively controlled" by the PRC or PRA as is required under Section 1237 for the CCMC designation to be appropriately applied.

---

[9] Defendants' counsel stated at oral argument that while the administrative record is not yet certified, at this time the government does not plan to rely on any additional evidentiary basis—such as classified information— to support Luokung's CCMC designation.  *See* Hr'g. Tr. 18:12.

The Decision Memo also recites a number of partnerships that Luokung has allegedly entered into, in an effort to show an affiliation with the PLA or PRC. These include (1) a July 2020, "strategic cooperation agreement" with the China National Geospatial Information Center, an organization of the PRC's National Development and Reform Commission, to "promote the wide application of geospatial information data and technical services in spatial planning, e-government, smart city, smart ecology, and smart agriculture," Decision Memo at 1–2; (2) a July 2020, "in-depth partnership" with the State-Owned Enterprise Yangtze River Yuntong Group Co., Ltd. ("Yuntong"), in order "to provide cooperation on digital city construction, smart city data operation, transportation, and municipal administration multi-level cooperation in technologies, products, and markets in areas such as smart service solutions for public industries," *id.* at 2; and (3) a 2019 "comprehensive cooperation" agreement between Luokung's wholly owned subsidiary eMapgo Technologies (Beijing) Co., Ltd. with Huawei Investment & Holding Co., Ltd, another company that has been designated as a CCMC, *id.* The Decision Memo states that these agreements constitute a "close affiliation" between Luokung and the PRC and even a "potential affiliation with the surveillance capabilities of the PRC National Police." *Id.*

The Court finds this conclusion to be altogether unsupported by substantial evidence. First, the reference to a "potential affiliation" between Luokung and the PRC National Police is completely conclusory and lacks any sort of support in the record. Moreover, "potential affiliation" is not the correct standard as used in Section 1237, an actual affiliation is required. The cited agreements also appear to largely preliminary. Plaintiffs assert that both the agreement with the China National Geospatial Information Center and Yuntong are "arm's length cooperation agreements for the potential future provision of commercial services by Luokung."

Pls.' Mot. at 30 (citing Li Decl. ¶ 34).  No projects have occurred with either entity to date.  *Id.*
Defendants do not dispute this assertion.

Even accepting all of the facts in the Decision Memo at face value, none compel the
conclusion that Luokung is "effectively controlled" by the PRC or PRA, as is required in order to
find that it was affiliated with these proscribed entities.  At most, the facts allow the conclusion
that Luokung may currently be or will one day provide products to entities with ties to the
Chinese state.  This behavior is no different than American technology companies such as
Apple.[10]  This is simply not enough to demonstrate it is under the "effective control" of the
Chinese state or military.  As a result, a reasonable person evaluating the Decision Memo would
necessarily conclude that there is plainly a lack of substantial evidence to adequately support a
finding that Luokung is a CCMC.  Consequently, the Court finds that the Department of
Defense's CCMC designation as to Luokung was arbitrary and capricious.

Plaintiffs also argue that Defendants' decision to designate Luokung as a CCMC is
arbitrary and capricious for the separate (but related) reason that Defendants "failed to articulate
in the record an adequate reasoned basis for the decision."  Pls.' Mot. at 22; *see also State Farm
Mut. Auto. Ins. Co.*, 463 U.S. at 43 (decreeing that an agency must "articulate a satisfactory
explanation for its action including a rational connection between the facts found and the choice
made.").  Defendants respond by arguing that a "rational connection" is present here due to the
"existence of cooperation agreements with Chinese government owned or controlled entities,
something that on its face shows the existence of affiliation with the PRC."  Defs.' Opp'n at 21;
*see also State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43 (noting that courts must "uphold a

---

[10] *See Apple's iCloud service in mainland to be run by China Telecom: company,* Global
Times (July 17, 2018), https://www.globaltimes.cn/content/1111251.shtml (noting that state-
owned China Telecom would operate Apple's iCloud business going forward).

decision of less than ideal clarity if the agency's path may reasonably be discerned.") (quoting *Bowman Transp. Inc. v. Ark.-Best Freight System*, 419 U.S. 281, 286 (1976)).  However, the Court finds it need not reach this issue of whether the Department of Defense provided a "rational connection"—which seems unlikely—given the Court has already found the designation decision to be arbitrary and capricious on the basis of a lack of substantial evidence.[11]

   b. *Luokung's CCMC Designation Also Exceeded the Department of Defense's Statutory Authority Under Section 1237*

   For the same reasons detailed above, Plaintiffs contend that the CCMC designation is unlawful under the APA because Luokung fails to meet the statutory criteria to be designated a CCMC pursuant to Section 1237. Pls.' Mot. at 24.  The Court agrees.

   As already detailed, the APA grants a reviewing court the authority to "set aside" an agency action that exceeds its statutory "authority" or "limitations." 5 U.S.C. § 706(2).  The relevant statutory limitation here is the statutory criteria drafted by Congress that the Department of Defense must follow when designating entities as a CCMC.

---

   [11] The Court also notes that the Luokung Decision Memo contains a number of errors and inaccuracies.  The document fails to explicitly identify the agency's source of authority to designate entities as CCMCs, (*i.e.*, Section 1237), and the relevant statutory language the decision document does import from Section 1237 is quoted incorrectly.  As the Court noted in its prior evaluation of this same issue in *Xiaomi*, "[t]hese errors do not inspire confidence in the fastidiousness of the agency's decision-making process."  *Xiaomi*, 2021 WL at *5 (citing *Poett v. United States*, 657 F. Supp. 2d 230, 236–37 (D.D.C. 2009) (finding an agency determination to suffer from "key flaws" when it "misquot[ed]" the statute at issue and applied "an incorrect definition" of a statutory term).  And as Plaintiffs' note, Defendants made additional errors— beyond what was present in *Xiaomi*—here.  Pls.' Reply at 12.  Namely, Defendants relied on a "summary" of Luokung's business that they contend is inaccurate and out of date, while also misnaming one of the entities with which Luokung was purported to contract.  *Id.*  Even if explained away as "harmless error" as Defendants urge this Court to do, Defs.' Opp'n at 22, this at the very least undermines Defendants' reliance on these purported facts, further weakening their overall basis for the determination.

Having determined the proper definition of the term "affiliated with," the Court concludes that based on the evidence before it, Luokung cannot be considered to be "effectively controlled by another or associated with others under common ownership or control" of any of the proscribed entities identified by Congress in Section 1237. *See supra* Section IV.A.1.a. Luokung is a publicly traded company that produces commercial products for civilian use, is controlled by an independent board and its controlling shareholder, and there is no evidence that it is effectively controlled by the PRC or its security services. *See* Pls.' Mot. at 26.  Accordingly, Luokung's classification as a CCMC exceeded the Department of Defense's statutory authority under Section 1237, in violation of the APA. *See* 5 U.S.C. §706(2). [12]

\*      \*      \*

The Department of Defense's CCMC designation process as to Luokung was flawed and failed to adhere to several different APA requirements.  As a result, the Court concludes that Plaintiffs are likely to succeed on the merits on their APA claims, fulfilling the first preliminary injunction requirement.[13]

---

[12] Plaintiffs also contend that Luokung's CCMC designation was made without observance of the procedure required by law,  as Defendants have failed to provide any evidence that the Department of Defense complied with Section 1237's express statutory requirement to consult with other agencies before making CCMC designation decisions.  Pls.' Reply at 14 (citing NDAA FY99 § 1237(b)(3)).  Defendants assert that this issue is premature as the administrative record has not yet been filed and deliberative process may be implicated, Defs.' Opp'n at 22 n.13, but as Plaintiffs correctly noted at oral argument, the government controls the administrative record, and could have at least filed a declaration to this effect, *see* Hr'g Tr. 8:9–23.  While the Court need not reach this issue at this time given the fulsome evidence that Luokung is likely to succeed on the merits of its APA claims on other grounds, this deficiency further emphasizes the general lack of care that accompanied this CCMC designation process.

[13] Because the Court concludes that Plaintiffs have demonstrated that they are likely to prevail on their APA claims, it need not reach Plaintiffs' constitutional due process claim at this time. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) (explaining the theory of constitutional avoidance and that as a matter of judicial restraint, courts should generally reach constitutional questions only when necessary).  However,

## B.  Irreparable Harm

The Court turns next to the question of whether Plaintiffs will suffer irreparable harm if denied injunctive relief.  To show irreparable harm, the D.C. Circuit requires that the movant demonstrate an injury that is "both certain and great . . . of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury be "beyond remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations and internal quotations omitted).  The movant must also show that the alleged harm "will directly result from the action which the movant seeks to enjoin."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  The Court finds that Plaintiffs have met this standard here.

Plaintiffs allege that in the absence of preliminary relief, they will be subjected to a host of irreparable harm stemming from the CCMC designation and resulting restrictions.  Pls.' Mot. at 42–45.  These alleged harms to Luokung's business include reputational damage along with various forms of unrecoverable monetary loss, including diminished access to capital, canceled contracts, loss of market share, and difficulty recruiting and retaining talent.  *Id.*[14]  Defendants dismiss these purported harms as "nothing more than theoretical outcomes," Defs.' Opp'n at 30, and assert that the economic harm described is not so significant or severe as to constitute the

---

the Court notes that Plaintiffs have raised serious concerns about Defendants' actions in this regard as well, and further notes that Defendants have conceded many of these points.  Suffice it to say that the Court is concerned that the Department of Defense subjected a public company to de-listing from the only stock market on which its shares were listed with no notice or process whatsoever.

[14] Plaintiffs have also alleged irreparable harms stemming from their alleged procedural due process injury and harm that will accrue to the Individual Plaintiffs as a result of the mandated divestment of Luokung shares and the loss of the opportunity to benefit from any future appreciation of their Luokung stock.  Pls.' Mot. at 44–45.  While not seeking to minimize the impact of these purported harms, the Court need not reach these claims at this time to conclude that relief is warranted.

type of "extreme hardship that would warrant a preliminary injunction," *id.* at 33.  The Court

disagrees, and concludes that the very serious unrecoverable financial harm Luokung has already

begun to experience, along with the reputational damage caused by the CCMC designation,

together constitute precisely the type of irreparable harm preliminary injunctive relief is designed

to address.

The Court begins with an analysis of the severity of the various unrecoverable financial

harms that Luokung will suffer if the CCMC designation and attendant restrictions go into effect.

In this Circuit the general rule is that "economic loss does not, in and of itself, constitute

irreparable harm," as economic injuries can later be made whole through monetary damages.

*Wis. Gas. Co.*, 758 F.2d at 674 (citations omitted).  However, as the Court explained in *Xiaomi*,

"when a plaintiff's alleged damages are unrecoverable, such as here, due to the sovereign

immunity enjoyed by Defendants, courts have recognized that unrecoverable economic loss can

indeed constitute irreparable harm."  2021 WL 950144, at *10 (collecting cases).  But this is not

to say that the existence of *any* unrecoverable financial injury from an entity that enjoys

sovereign immunity means irreparable harm can be established.  Rather, the economic harm in

question must be sufficiently "significant."  *Id.*  The Court finds that Luokung faces this type of

"significant" unrecoverable economic injury here.

The Court begins with a review of the economic loss that has already come to pass.

Since the announcement of the CCMC designation, Luokung has had "[t]wo key customers,"

including Luokung's second largest customer from the past year, terminate their contracts

specifically due to the forthcoming CCMC designation and prohibitions.  Pls.' Reply at 20; Li

Decl. ¶ 43.  This loss will result in "more than $10 million dollars in lost revenue" in just this

year alone.  Pls.' Reply at 20–21 (citing Li Decl. ¶ 43).  In addition,  assuming similar contract

cancellations accelerate once the CCMC designation goes into full effect, Luokung faces a high likelihood that its overall market share will decline as it loses customers to its competitors that are not saddled with the CCMC designation.  *See Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) (recognizing that "diminished market share can constitute irreparable harm.").  Indeed, in *Xiaomi*, the Court recognized precisely this same type of harm as constituting "significant" economic loss.  *Xiaomi*, 2021 WL 950144, at *11.

Moreover, the magnitude of Luokung's economic injuries will expand exponentially on May 8, 2021, when the CCMC delisting requirements go into effect.  Nasdaq, the only public trading market for Luokung's shares, has stated that it will halt all trading of Luokung's securities and delist it entirely effective on this same date.  *See* Supp. Decl. Elizabeth Fei Chen Ex. A at 1, ECF No. 29-2; *see also* Li Decl. ¶ 47.  This action will deprive Luokung shareholders of the only public market to trade Luokung shares.  Li Decl. ¶ 47.  As a result, this massive restriction on liquidity will "place enormous downward pressure on the share price."  *Id.; see also Norlin Corp. v. Rooney, Pace, In*c., 744 F.2d 255, 267–68 (2d Cir. 1984) (affirming finding that "delisting of securities generally is a serious loss of prestige and has a chilling effect on prospective buyers").  Further compounding the situation, the FTSE Russell has also removed Luokung from its stock indices due to the recent CCMC designation, a ban that will remain in effect as long as the CCMC designation is in place.  Pls.' Reply at 22 (citing Li Decl. ¶ 48).

Defendants attempt to argue that this case can be distinguished from *Xiaomi* on the basis of the "enormity" of the financial losses Xiaomi suffered, where the substantially larger company had faced a 9.5% drop in stock price and a $10 billion loss of market capitalization following the announcement of its designation as a CCMC.  Defs.' Opp'n at 33.  While it is true that Plaintiffs have not provided concrete numbers to this effect here, the Court does not find this fact

necessary to conclude that Luokung is facing serious financial harm.  As already described, Nasdaq is the only public trading market for Luokung's shares.  Unlike Xiaomi, which was traded on the Hong Kong Stock Exchange and thus could continue trading with only the loss of American shareholders and financial institutions, Luokung is facing the complete loss of *any* public market for its securities.  If anything, this imminent harm Luokung faces is even more severe than that the Court found sufficient in *Xiaomi.*

The CCMC designation and resulting prohibitions will also cut off Luokung's access to U.S. capital markets, a key source of its funding for research and development as well as ongoing strategic acquisitions.  Since being publicly listed on the Nasdaq, Luokung has raised $190 million in funding, $100 million of which was generated from U.S. investors or financial institutions that will be barred under the CCMC restrictions.  Li Decl. ¶ 39.  Without access to this capital, Luokung represents that it will be unable to remain competitive in the rapidly evolving technology fields in which it currently competes.  *Id*. ¶ 38.  And as the Court has already analyzed at length, deprivation of access to U.S. capital markets is not something that is easily replaceable.  *See Xiaomi*, 2021 WL 950144, at *11 (noting that U.S. capital markets provided 72% of all financing worldwide for non-financial firms).  Accordingly, this loss also constitutes serious financial harm.

Furthermore, the delisting combined with the stigmatic effect of the CCMC designation will negatively impact Luokung's ability to recruit or retain top talent.  Plaintiffs note that "several potential recruits" to the company, which relies on its talent to remain competitive in the high-tech industries in which it operates, "are reluctant" to join Luokung as a direct result of the pending designation.  Li Decl. ¶ 44.  Current employees face a similar quandary, given that 73% of total compensation for core employees in the past year was in the form of stock and stock

options.  *Id.* ¶ 45.  Indeed, Baomin Li, Luokung's Chief Technology Officer, stated in his

declaration that if the prohibitions go into effect, the financial repercussions will force him to

sever ties with Luokung.  *Id.* ¶ 50.  This loss of talent and the inability to "recruit and retain

employees to build—or even maintain—[a plaintiff's] business" also constitutes irreparable

harm.  *TikTok Inc. v. Trump*, No. 20-cv-02658, 2020 WL 5763634, at *8 (D.D.C. Sept. 27,

2020)); *Xiaomi*, 2021 WL 950144, at *12; *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp.

2d 30, 43 (D.D.C. 2000) (noting that Courts have found irreparable harm where the movant has

shown that "economic loss would significantly damage its business above and beyond a simple

diminution in profits.").

Finally, contrary to Defendants' assertions, these injuries have either already occurred or

are directly imminent due to the prohibitions that will begin later this week, and are thus far from

the prohibited type of "speculative" or "theoretical" harms as Defendants try to imply.  Defs.'

Opp'n at 30–31.  These harms also are of such substantial economic impact—particularly when

considered in the aggregate— to meet the requirement of "significant" economic losses.

Luokung also faces lasting reputational damage—a non-economic harm— from being

branded a CCMC.  Having already considered this issue in *Xiaomi*, the Court found that "[i]t is

almost unquestionable" that the imposition of a CCMC designation will damage a company's

"reputational standing with corporate customers and business partners."  *Xiaomi,* 2021 WL

950144, at *9.  The Court based this conclusion on then-President Trump's November 12, 2020,

Executive Order that served as a precursor to the formal listing of Luokung as a CCMC a few

months later.  This order stated that "[CCMC] companies, though remaining ostensibly private

and civilian, directly support the PRC's military, intelligence, and security apparatuses and aid in

their development and modernization . . . allow[ing] the PRC to directly threaten the United

States homeland and United States forces overseas, including by developing and deploying weapons of mass destruction, advanced conventional weapons, and malicious cyber-enabled actions against the United States and its people." *Id.* (citing E.O. 13959).  This long-term reputational harm—that implies that Luokung is essentially a Chinese state organ seeking to undermine the security of the United States— is also sufficiently severe to constitute irreparable injury.

The Court concludes that Plaintiffs have met their burden by demonstrating that they face imminent, severe, and unrecoverable economic injury as well as irreparable reputational harm. Accordingly, this factor also weighs in favor of granting injunctive relief.

### C.  Balance of the Equities and Accord with Public Interest

The remaining two preliminary injunction factors—the balance of the equities and accord with public interest—also urge granting injunctive relief.  These two factors merge into a single inquiry in situations such as the case at hand, when the government is the defendant.  *Nken*, 556 U.S. at 435.

The Defendants argue that the issuance of a preliminary injunction in this instance would be inappropriate given that "[t]he equities favor the security and prosperity of the United States over the wealth of one particular corporation and its investors."  Defs.' Opp'n at 35.  This nation's security priorities are undoubtedly important public interests.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010) (noting that courts must grant deference to the executive branch when "sensitive and weighty interests of national security and foreign affairs" are at issue).  However, as this Court has already expressed in *Xiaomi*, it is "somewhat skeptical that weighty national security interests are actually implicated here."  2021 WL 950144, at *12.  This is not, as the government seeks to imply, due solely to the fact that "past

administrations did not employ Section 1237." Defs.' Opp'n at 35–36 n. 20.[15]  Rather, it is

because the record as it stands does not support the conclusion that Luokung meets the statutory

requirements to be designated as a CCMC that poses a threat to American security interests.

Luokung's CCMC designation was based on a handful of innocuous facts gathered from

company press releases, not any classified security intelligence.  Indeed, many of the

associations the Department of Defense seemed most troubled by—such as Luokung's purported

forays into space systems, or its potential future contracts with the China National Geospatial

Information Center or Yungtong, *see* Defs.' Opp'n at 36–37—do not appear to have

materialized, nor are they likely to bear fruit before this case can be decided on the merits.

Further emphasizing this point, the government has not identified a single technology transfer

from Luokung to the PRC.  Deference is only appropriate when national security interests are

actually at stake, which the Court concludes is not evident here.

In contrast to this diminished national security interest, the Court must also consider the

"substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'"  *League of Women Voters v. Newby*, 838 F. 3d 1, 12

(D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  This is

particularly true in the APA context.  *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7,

---

[15] To be sure, the Court did mention in *Xiaomi,* and finds it persuasive here, that Section 1237's CCMC designation authority went unused for almost twenty years (in fact violating the yearly reporting requirement as mandated by the statute) until a number of designations were made in the final days of the Trump Administration.  While the Executive certainly retains the power to choose which methods to use to safeguard the nation's security, the lack of use of this particular method provides at least *some* support for the assertion that the CCMC designation process is less than critical to maintaining this nation's security.  But more importantly, this remains a secondary point.  For as detailed at length, Luokung does not appear to meet the definition of a CCMC, meaning it does not pose a national security risk that can be properly addressed under Section 1237.

21 (D.D.C. 2009) ("[t]he public interest is served when administrative agencies comply with their obligations under the APA.").  Given that Plaintiffs have demonstrated that they will likely prevail on their APA claims, the Court finds this "substantial public interest" to be implicated here.  Furthermore, despite the Defendants' invocation of national security interests, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.  In sum, both the balance of the equities and the public interest are served by granting relief in this case.

Considering all four relevant preliminary injunction factors, the Court concludes that a preliminary injunction is warranted here.  Accordingly, the Court will preliminarily enjoin the prohibitions against Luokung in full.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction (ECF No. 26) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 5, 2021                                      RUDOLPH CONTRERAS
                                                         United States District Judge